IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SEAN BRYDGES and GERARD SCANLAN :
 :
  PLAINTIFFS, :
 :
-against- : Civil Action No.:  2:21-cv-00492
 :
RIDLEY TOWNSHIP POLICE DEPARTMENT, :
RIDLEY TOWNSHIP, AND SCOTT :
WILLOUGHBY, *Individually*, EDWARD PISANI, :
*Individually,* and ROBERT J. WILLERT*,* :
*Individually*, JOSEPH A. RYAN, *Individually* :    :
 :
  DEFENDANTS. :

## CIVIL ACTION--COMPLAINT

PLAINTIFFS, SEAN BRYDGES and GERARD SCANLAN, respectfully allege the following claims, as for their complaint against the above captioned Defendants, upon information and belief as follows:

## NATURE OF THE CASE

Plaintiff complains pursuant to the First Amendment for Violations and Retaliation; Pennsylvania Whistleblower Law Violation of Section 1423; Violation of Pennsylvania Common Law, Intentional Infliction of Emotional Distress; Pennsylvania Common Law Violation, Negligent Infliction of Emotional Distress; Violation of Pennsylvania Statute, 42 Pa.C.S.A. § 8343, for Defamation; Violation of Common Law, Invasion of Privacy—False Light, Restatement (Second) of Torts § 625 E; Civil Conspiracy and Civil Conspiracy Aiding and Abetting.

## JURISDICTION AND VENUE

1. Jurisdiction of this action is conferred upon this Court as this action involves a Federal question under Title 42 USC, Chapter 21, Subchapter 1 Section 1983.

2. The Court also has supplemental jurisdiction over the state causes of action.

3. Plaintiffs are citizens of the Commonwealth of Pennsylvania residing within venue of this Eastern District of Pennsylvania District Court.

4. Defendant Ridley Township is a First-Class Township located in Delaware County, Pennsylvania and its law enforcement department the Ridley Township Police.

5. Defendant Robert J. Willert was employed as the Ridley Township Police Commissioner and as the President of the Ridley Board of Commissioners.

6. At all relevant times, defendant Scott Willoughby was employed as a Ridley Township Police Captain.

7. At all relevant times prior to February 2020, defendant Edward Pisani was employed as the Ridley Township Manager, at all relevant times thereafter defendant Pisani was employed as the Commissioner of Public Safety.

8. At all relevant times after February 2020, defendant Joseph Ryan was employed as the Ridley Township Manager.

9. Venue is proper in this district since Plaintiff was employed by Defendants within the Eastern District of Pennsylvania.

10. The matter in controversy exceeds $75,000.

## PARTIES

11. Plaintiff, Sean Brydges (hereinafter referred to as "PLAINTIFFS" and/or "BRYDGES") is an individual male who resides at 202 Lakeview Drive, Ridley Park, Pennsylvania 19078. At all relevant times BRYDGES was employed as a narcotics officer with Ridley's Township's Anti-Crime Unit, supervised by the defendants.

12. Plaintiff, Gerard Scanlan (hereinafter referred to as "PLAINTIFFS" and/or "SCANLAN") is an individual male who resides at 1424 Greenway Road, Swarthmore, Pennsylvania 19081. At all relevant times SCANLAN was employed as a narcotics officer with Ridley's Township's Anti-Crime Unit, supervised by the defendants.

13. Defendant, Ridley Township Police Department (hereinafter referred to as "POLICE"), whose principal offices are located at 100 East McDade Boulevard, Folsom, Pennsylvania 19033, is governmental law enforcement agency for Ridley Township, a township of the first class located in the Commonwealth of Pennsylvania.

14. Defendant, Ridley Township (hereinafter referred to as "TOWNSHIP"), is township of the first class, whose principal governmental offices are located at 100 East McDade Boulevard, Folsom, Pennsylvania 19033, and is a governmental agency in the Commonwealth of Pennsylvania.

15. Defendant, Robert J. Willert, (hereinafter referred to as "WILLERT"), is an individual male employed as Police Commissioner of Ridley Township, whose principal governmental offices are located at 100 East McDade Boulevard, Folsom, Pennsylvania 19033.

16. Defendant, Scott Willoughby, (hereinafter referred to as "WILLOUGHBY") is an individual male employed as the Captain of the Ridley Township Police Department and at all times material, WILLOUGHBY was the PLAINTIFFS' direct supervisor.

17. Defendant, Edward Pisani, (hereinafter referred to as "PISANI") is an individual male who was employed as the Ridley Township Manager, in an administrative position overseeing the governmental agencies of Ridley Township until February, 2020. After February 2020, PISANI was employed as the Ridley Township Public Safety Commissioner in an administrative position overseeing the public safety services of Ridley Township

18. Defendant, Joseph Ryan (hereinafter referred to as "RYAN") is an individual male who is employed as the Ridley Township Manager, in an administrative position overseeing the governmental agencies of Ridley Township

## STATEMENT OF FACTS

19. At all relevant times, PISANI and WILLERT were high ranking Ridley Township officials who received complaints of corruption occurring with the police.

20. On or about 2014, WILLOUGHBY handed PLAINTIFFS $8000.00 in cash and ordered them to repackage it with evidence that contained seized cash from a prior narcotics arrest.

21. WILLOUGHBY was trying to impede an active criminal investigation conducted by the Criminal Investigation Division (CID) of missing cash funds and property.

22. CID was actively investigating a Delaware County employee, Mary Lynch, for a monetary theft from a Ridley Township narcotics case.

23. As part of the investigation, CID sought to interview the PLAINTIFFS regarding evidence tampering and theft of proceeds from a drug case initiated by the PLAINTIFFS.

24. CID believed that the thefts and tampering were committed by Mary Lynch a secretary employed by Delaware County District Attorneys office,

25. By information or belief, WILLOUGHBY was concerned that CID was going to investigate the evidence room and that he could be charged with several crimes.

26. By information or belief, WILLOUGHBY would remove cash seized from narcotics arrest and then later replace it with cash seized from new narcotics arrests.

27. The drug arrests were primarily made by the Anti-Crime Unit run by the Plaintiffs.

28. When the PLAINTIFFS reported WILLOUGHBY to PISANI, PISANI advised them that their report would be confidential and that WILLOUGBHY would not find out who made the report against him.

29. Almost immediately after PLAINTIFFS first report to PISANI, WILLOUBHBY began retaliating against the Plaintiffs.

30. WILLOUGHBY retaliated against the PLAINTIFFS by intimidating them, harassing them, imposing unwarranted discipline against them, reducing or denying their work hours, affecting their wages and by seeking to discredit their police work, by defaming them to other police officers and the community.

31. WILLOUGHBY'S other acts of retaliation against the PLAINTIFFS included restricting them from the use of necessary police equipment; revealing the identity of confidential informant in use by the PLAINTIFFS; threatening to post the identities of PLAINTIFFS (who are undercover police officers) in the newspaper accusing them

of burglary and other numerous unlawful acts known and unknown to the PLAINTIFFS.

32. For the next few years, PLAINTIFFS reported every incident of WILLOUGHBY's retaliation against them to PISANI and WILLERT.

33. Since 2014, WILLOUGHBY has continuously retaliated against the PLAINTIFFS.

34. The PISANI and WILLERT failed to act to stop WILLOUGHBY's retaliation.

**The 2014 through 2016 investigation by Ridley Township's Criminal Investigation Division (CID) of Ridley Township's Police Evidence Room.\**

35. BRYDGES and SCANLAN were employed by the Ridley Township Police as the only two narcotics detectives actively engaged in drug investigations as members of the Anti-Crime Unit.

36. PLAINTIFFS in the course of their employment made numerous narcotics arrests often seizing large quantities of drugs and cash.

37. After these arrests, PLAINTIFFS' recorded all property seizures as evidence, duly marking and packaging the evidence and cataloging the cash by denomination.

38. Cash seizures would then be placed in a secure evidence envelope and held in the Ridley Police Evidence Room until the arrested defendant's trial and/or conviction.

39. After the defendant's conviction(s), the seized money would be received by the Delaware County Forfeiture Unit.

40. On or about the end of year 2014, the DEFENDANTS were notified that the Delaware County Criminal Investigation Division Unit (CID) was investigating seized cash held in evidence room.

41. As part of CID's investigation, an audit and inventory of the confiscated cash and evidence was imminent.

42. Prior to CID's audit, WILLOUGHBY ordered the PLAINTIFFS to re-package $8000.00 which was confiscated and recorded into evidence as part of a drug arrests.

43. PLAINTIFFS questioned why they were required to re-package evidence since it had already been counted, recorded and submitted to the Evidence Room.

44. PLAINTIFFS knew by re-packaging the evidence the "chain of custody" would be broken and would negatively impact the prosecution of the criminal case.

45. WILLOUGHBY admonished the PLAINTIFFS for questioning him and again ordered them to re-package the money.

46. When PLAINTIFFS looked at the sealed evidence bags they realized that they had been tampered with.

47. PLAINTIFFS realized that the bills that were in evidence bags were not the same as what they seized; the evidence bags had been re-packaged.

48. PLAINTIFFS immediately notified Ridley Township's manager, PISANI who advised them that he would notify the Police Commissioner WILLERT.

49. PISANI, WILLERT and PLAINTIFFS met to explain the incident in person.

50. At the meeting, Plaintiffs expressed concerns because WILLOUGHBY was their "boss" and if he became aware of their report, he would retaliate against them.

51. PISANI and WILLERT reassured Plaintiffs that no one would be aware of the report.

52. By information or belief, WILLOUGHBY found out about the PLAINTIFFS report to PISANI from PISANI.

53. Two days after the report, WILLOUGHBY began to retaliate against them.

**The first incident of retaliation against PLAINTIFFS**

54. WILLOUGHBY seemed irate and angry at the PLAINTIFFS two days after they made their report to PISANI and WILLERT.

55. First, WILLOUGHBY denied PLAINTIFFS' the use of a "take home vehicle" regularly driven by them to conduct drug investigations. The bulletin which denied the PLAINTIFFS use of take home cars is attached hereto as Exhibit 1.

56. PLAINTIFFS immediately reported WILLOUGHBY'S refusal to allow PLAINTIFFS access to the "take home" vehicles to WILLERT and PISANI.

57. The next day, WILLERT approved the use of the "take home" vehicle.

58. WILLERT's approval of the vehicles seemed to anger WILLOUGHBY even more.

**The unlawful hinderance by Willougby and Pisani of an investigation by the Delaware County Drug Task Force and Pennsylvania Liquor Control Board Investigation (February 2016).**

59. On or about February 2016, the Anti-Crime Unit was asked to change their schedule to assist with nuisance bar complaints at the RS Club located at 1936 W. McDade Boulevard, Woodlyn, Pennsylvania.

60. PLAINTIFFS were instructed by WILLOUGHBY to assist the Delaware County Drug Task Force and the Pennsylvania State Liquor Control Enforcement to coordinate upcoming raids on nuisance bars.

61. On or about February 20, 2016, SCANLAN conducted a large roll call with approximately 50 officers present, all members of law enforcement organizations.

62. The liquor raid continued as planned, when RS CLUB was targeted and law enforcement arrived, there were very few patrons in the bar at a time where there would generally be a large number of patrons.

63. PLAINTIFFS noticed WILLOUGHBY acting in a strange manner during the raid.

64. PLAINTIFFS advised PISANI that it was their opinion that someone tipped off the owner of the RS Club Bar.

65. PISANI agreed that WILLOUGHBY was acting strange and that he was patrolling everywhere in town but where the detail was.

66. The following week, PISANI told the PLAINTIFFS that he reviewed phone calls from WILLOUGHBY's office and discovered calls to the owner of the RS Club Bar, prior to the liquor raid.

67. PLAINTIFFS demanded that PISANI report this discovery to WILLERT and to begin an immediate investigation of WILLOUGHBY.

68. By information or belief, PISANI did not investigate WILLOUGHBY.

69. By information or belief, WILLOUGHBY learned of PLAINTIFFS report to PISANI from PISANI.

**Willoughby's cover up of missing cash ($1000.00) from case no.: CP-23-CR-0000860-2015 by unlawfully ordering to create and "back date" supplemental report (May 2016).**

70. On or about May 2016, PLAINTIFFS were notified that the Delaware County District Attorney's office requested $28,711.00 (cash), the amount seized from case CP-23-CR-0000860-2015, since the case resulted in a conviction. The relevant section of the incident report is attached hereto as Exhibit 1.

71. PLAINTIFFS were notified by Sergeant Henderson (hereafter refer to as "HENDERSON") and PISANI that there was only $27,711.00 in evidence from the arrest. The funds were $1000.00 short.

72. All evidentiary records, including pictures from the Anti-Crime Unit attached hereto as Exhibit , verified that the amount seized by the PLAINTIFFS was $28,711.00 and that it had been placed in evidence more than a year prior.

73. WILLOUGHBY had taken the missing money and later asked PISANI to take $1,000 from the Police General Fund to replace the missing money.

74. PISANI refused WILLOUGHBY.

75. WILLOUGHBY then ordered HENDERSON to write and "back date" a supplemental report and attach it to the original evidence collection report. Exhibit 2.

76. At WILLOUGHBY's direction HENDERSON wrote the supplemental report, "back dated" it and attached it to the original evidence collection report. Exhibit 2.

77. The supplemental report stated that PLAINTIFFS miscounted the seized money. Exhibit 2.

**Willoughby's attempt to "under report" the Anti-Crime Unit arrests (June 2016).**

78. On or about June 1, 2016, WILLOUGHBY ordered a corporal under his command to access the Anti-Crime Unit's database and change the records to "under report" the number of arrests by PLAINTIFFS and the Anti-Crime Unit.

79. WILLOUGHBY's wanted to discredit the PLAINTIFFS at a future meeting with WILLERT.

80. At the meeting, WILLOUGHBY insisted to WILLERT that PLAINTIFFS over-reported their arrests to exaggerate the unit's success.

81. On June 9, 2019, PISANI sent the Anti-Crime Unit a group text requesting Plaintiffs' presence at a meeting with WILLERT that same morning at 7:15 am.

82. PLAINTIFFS were instructed to bring their arrest reports, statistics and they were advised that new rules in reporting arrests were to be implemented.

83. Prior to the meeting WILLOUGHBY accused PLAINTIFFS of over-reporting their narcotics arrests.

84. PLAINTIFFS denied WILLOUGHBY'S accusations to WILLERT.

**Willoughby's continued efforts to undermine the Anti-Crime Unit (June 2016).**

85. On or about June 15, 2016, Assistant District Attorney Brian Doherty (hereafter referred to as "DOHERTY") requested all evidence, on a specific case, be sent to the County Courthouse Evidence Room for a trial on Wednesday, June 22, 2016.

86. As per police procedure, immediately after the arrest, PLAINTIFFS inventoried and recorded the confiscated evidence and submitted it to the evidence room.

87. One of the pieces of evidence was a pink and black handgun.

88. On June 16, 2016, this evidence was turned over to the Delaware County Courthouse Evidence Room, missing was the pink and black handgun.

89. Late in the afternoon on June 16, 2016, PLAINTIFFS were notified by DOUGHERTY that the gun was not turned over to the Delaware County Courthouse Evidence Room.

90. PLAINTIFFS did not have access to the Ridley Township evidence room and they knew the criminal prosecution of the case would be affected if they didn't find the gun.

91. PLAINTIFFS' notified PISANI of the missing handgun at 8:00 am, on Monday, June 20, 2016 and their belief that it had been removed from the evidence room by someone with access.

92. By information or belief, PISANI contacted WILLOUGHBY at 8:30 am on the same day.

93. The gun was found an hour later.

94. By information or belief, WILLOUGHBY took the gun from evidence and returned it when PISANI called him.

**Willoughby ordered Officer Borak not to assist the Anti-Crime Unit in**

**transporting evidence to the State Lab or Delaware County Courthouse.**

95. On or about that same, after the gun was found, a note was left in PLAINTIFFS office by Sergeant PALO (hereafter referred to as "PALO") stating that Officer Borak (hereafter referred to as "BORAK") was ordered not to bring the missing gun to the Delaware County Courthouse.

96. At that time, Officer BORAK's job assignment for the POLICE was to transport evidence of criminal cases to the Delaware County Courthouse Evidence Room.

97. The chain of custody paperwork in the case folder had a white label over BORAK's name for an Anti-Crime Unit member to fill it out.

98. BORAK was anticipated to be part of the "chain of custody" as he was in all other criminal cases.

99. As PLAINTIFFS were leaving to take the handgun to the Courthouse when they encountered BORAK.

100. BORAK told the PLAINTIFFS that he was ordered by WILLOUGHBY and PALO <u>not</u> to transport the handgun even though he was on his way there.

101. BORAK was also instructed by WILLOUGHBY and PALO that from that day forth he was <u>not</u> to take any of PLAINTIFFS' evidence to the Courthouse.

102. On or about Monday, August 8, 2016, the Anti-Crime Unit made two more narcotics arrests and completed the requisite evidence report and request for a lab report.

103. The seized narcotics were then to be transferred by BORAK to the State Police Lab.

104. BORAK's official duties also included transporting all seized narcotics from arrests by the POLICE to the Pennsylvania State Police Lab.

105.   By information or belief, WILLOUGHBY also ordered BORAK not to transport any narcotics confiscated by the PLAINTIFFS to the lab.

106.   On or about Tuesday, August 9, 2016, BORAK was now ordered by WILLOUGHBY to no longer complete the case folders in any arrests made by the Plaintiffs.

By information or belief, WILLOUGHBY wanted to ensure the PLAINTIFFS would not receive assistance or support from any member of the POLICE.

## The Prison Tapes (August 2016)

107.   On or about August 4, 2016, the PLAINTIFFS listened to prison phone call tapes.

108.   The conversations were between a subject named James Curtain (hereafter referred to as "CURTAIN") who was in Delaware County Prison, and a non-inmate Mike Melagrano (hereafter MELAGRANO).

109.   MELAGRANO and CURTAIN discussed confidential information about the PLAINTIFFS triggering safety concerns for the Anti-Crime Unit

## Willoughby orders Plaintiffs to lie to Assistant District Attorney McKenna and to the Haverford Township Police.

110.   On or about August 2017, WILLOUGHBY ordered the PLAINTIFFS to lie to Delaware County, Deputy District Attorney McKenna (hereinafter MCKENNA) that a defendant, William Haney (hereinafter known as HANEY), cooperated with them as a confidential informant.

111.   WILLOUGHBY told the PLAINTIFFS to tell MCKENNA that HANEY provided them with important narcotics intelligence, so that MCKENNA would withdraw the charges against HANEY.

112.   PLAINTIFFS told MCKENNA that WILLOUGHBY had ordered them to lie.

113.   By information or belief, HANEY was employed by WILLOUGHBY's personal friend, Paul Cloud (hereafter referred to as "CLOUD").

114.   WILLOUGHBY told the PLAINTIFFS that he promised CLOUD to get HANEY out of trouble in exchange for the work that CLOUD had done at his home.

115.   PLAINTIFFS refused to lie to MCKENNA.

**Plaintiffs are ordered to lie to the Haverford Township Police Narcotics Unit.**

116.   On or about February 2018, WILLOUGHBY called the PLAINTIFFS to ask to for help to get his daughter's juvenile boyfriend out of trouble with the Haverford Township Police Narcotics Unit.

117.   The juvenile was arrested for possession of marijuana.

118.   WILLOUGHBY said he wanted the PLAINTIFFS to say the juvenile male provided drug information to the Ridley Township Police Narcotics Unit.

119.   PLAINTIFFS reported to Lt. Hamill of the Ridley Township Police (hereinafter "HAMILL") that WILLOUGHBY wanted them to lie to the Haverford Township Police Narcotics Unit.

120.   SCANLAN refused to lie to the Haverford Township Police Narcotics Unit and refused to back up WILLOUGHBY.

121.   WILLOUGHBY told PLAINTIFFS days later that he had an argument with MCKENNA and a Havertown Police Administrator regarding his attempt to have PLAINTIFFS provide them with misinformation.

122.   WILLOUGHBY was angry with the PLAINTIFFS for their failure to cooperate.

**Willoughby reveals the identity of the confidential informant.**

123.   At the end of February 2018, BRYDGES arrested a defendant (hereinafter, "Defendant X") for narcotics violations and seized over $237,000 in illicit proceeds.

124.   The confidential informant who worked with BRYDGES provided substantial assistance resulting in the arrest and seizure of Defendant X.

125.   To protect the confidential informant's identity, BRYDGES obtained a sealed search warrant.

126.   WILLOUGHBY made it clear on several prior occasions that he wanted to get at BRYDGES and SCANLAN and to shut down the Anti-Crime Unit.

127.   On or about March 13, 2018, BRYDGES received a call from a Chester Narcotic police officer stating he received a call from the defendant X's criminal defense attorney claiming he knew the identity of the confidential informant.

128.   PLAINTIFFS, WILLOUGHBY, Chester Narcotics Officer and DEA Agent were the only law enforcement officers who knew the confidential informant's identity.

129.   The search warrant was still sealed at this time and accessible only to law enforcement.

130.   On or about March 12, 2018, WILLOUGHBY, openly stated that he knew the identity of the confidential informant.

131.   By information and belief, WILLOUGHBY, who was close friends with the defense attorney, revealed the confidential informant's identity to said attorney.

132.   On or about April 2018, Major Gretsky (hereinafter GRETSKY) from the Chester Police Department was working at Liberty's Tavern in the Woodlyn section of Ridley Township.

133.   By information or belief, PALO was sent there by WILLOUGHBY since he was banned from communicating with Chester Police officers.

134.   A short time later, WILLOUGHBY told GRETSKY not to call the PLAINTIFFS to assist them in handling drug cases and arrests because he didn't want the PLAINTIFFS to earn overtime.

135.   The following week, GRETSKY received a text message from WILLOUGHBY that stated that "I thought I told you not to invite the Anti-Crime Unit" to Chester for overtime work.

136.   In response, GRETSKY told WILLOUGHBY that his brother was in charge of the drug unit and will invite the Anti-Crime Unit to work whenever he wants.

137.   WILLOUGHBY responded to GRETSKY that he had nothing but time on his side and he will "get them guys."

138.   The PLAINTIFFS notified HAMILL of WILLOUGHBY'S constant retaliation.

139.   HAMILL acknowledged that he was already aware of the situation and stated that WILLOUGHBY told him that he was looking to "get us."

140.   Again, PLAINTIFFS notified PISANI of the WILLOUGHBY's threats.

141.   On or about April 27, 2018, BRYDGES approached WILLOUGHBY and asked him to stop saying that he was going to "get them," and to stop threatening to replace them by offering PLAINTIFFS' jobs to other officers.

142.   WILLOUGHBY became irate and stated screaming, "Oh, I'm gonna get both of you!"

143.   WILLOUGHBY told BRYDGES that he was working on getting rid of the Anti-Crime Unit and demoting the PLAINTIFFS.

144.   WILLOUGHBY's acts were in retaliation for the reports of his unlawful acts made by the PLAINTIFFS to WILLERT and PISANI.

**Willoughby threatens to reveal Officer Brydges' identity to jeopardize his safety.**

145.   On or about May 3, 2018, BRYDGES received a call from a Chester City Police Detective regarding a conversation he had with WILLOUGHBY.

146.   The Chester City Detective advised BRYDGES that he was in WILLOUGHBY's office doing paperwork the previous week.

147.   WILLOUGHBY stated to him that he was going to post a picture of BRYDGES in the newspaper so he could no longer work undercover in the county.

148.   WILLOUGHBY told him, "he was going to get the pictures of the PLAINTIFFS from Facebook and hand them out to his "niggers."

149.   WILLOUGHBY said he wanted his "niggers" from Chester to get the PAINTIFFS."

150.   The Chester City Detective then said that WILLOUGHBY said he knows this is a safety issue and wanted to make sure the Chester guys were alright with doing this.

151.   PLAINTIFFS believe that WILLOUGHBY was discussing physical assaults by the "Chester guys" against them.

152.   PLAINTIFFS then met with HAMILL who again described the conversation with WILLOUGHBY where he said he was going to get "them guys."

153.   HAMILL asserted that he told PISANI about WILLOUGHBY's threats.

154.   BRYDGES believed that WILLOUGHBY would follow through with his threats and he was worried about the safety of his wife and children.

155.   On or about May 12, 2018, BRYDGES purchased security cameras for his house after learning of WILLOUGHBY'S threats against him and SCANLAN.

156.   On or about Thursday, May 24, 2018, PLAINTIFFS met with PISANI and WILLERT who stated that they spoke to WILLOUGHBY and he admitted making threats against the PLAINTIFFS.

157.   PLAINTIFFS complained to PISANI and WILLERT that WILLOUGHBY'S

158.   These retaliatory acts were abusive and emotionally damaging and they felt unsafe at work.

159.   The PLAINTIFFS advised that they felt it was impossible to continue working in those conditions and asked PISANI and WILLERT to conduct a detailed investigation.

160.   PISANI and WILLERT agreed and said they would look into moving the Anti-Crime Unit's office away from the police department.

161.   PISANI and WILLERT suggested that PLAINTIFFS take off from work if they needed to stay away from the hostile work environment created by WILLOUGHBY.

162.   By information or belief, sometime later, after Ridley Township Police meeting, WILLERT and PISANI advised the sergeants in attendance that all claims made by the Plaintiffs about WILLOUGHBY were un-substantiated.

**Willoughby's denial of Plaintiffs' overtime.**

163.   On or about the week of July 22, 2019, the PLAINTIFFS spent the week testifying at the Delaware County Courthouse in Media.

164.   PLAINTIFFS submitted overtime and compensation time hours for payment of time accrued from being at the courthouse during the trial.

165.   The overtime was first approved on July 26, 2019, then unapproved, by WILLOUGHBY.  The time card records showing this action is attached hereto as Exhibit 4.

166.   PLAINTIFFS' filed an official grievance with Fraternal Order of Police against WILLOUBHBY and challenged his denial of their overtime and comp time. The request for legal aid through the Fraternal Order of Police is attached hereto as Exhibit 5.

167.   On or about Thursday, August 1, 2019, PLAINTIFFS spoke to PISANI who (once again) agreed that WILLOUGHBY was harassing them because the Anti-Crime Unit was successful in securing a conviction the week before.

168.   On that same date, PLAINTIFFS provided PISANI a letter regarding the overtime hours that were first approved, then later denied by WILLOUHBY.

169.   In their letter, the PLAINTIFF'S referred to prior emails regarding WILLOUGHBY's retaliation against them, ignored by PISANI and WILLERT.

170.   WILLOUGHBY wanted the Anti-Crime Unit to fail so he could continue to harass and retaliate against PLAINTIFFS because they reported his unlawful acts.

171.   WILLOUGHBY wanted to deny the PLAINTIFFS overtime and eventually remove them from the Anti-Crime Unit and demote them.

172.   A short time later, PISANI contacted the PLAINTIFFS and advised that they would be paid for all their overtime.

173.   PISANI also advised that he would speak to WILLERT to end WILLOUGHBY'S retaliation against the PLAINTIFFS.

174.   On or about August 5, 2019, PLAINTIFF'S comp time and overtime was
approved, overruling WILLOUGHBY.

**Investigation for Burglary of Willoughby's Office names Plaintiffs as suspects.**

175.   On or about September 4, 2019, WILLOUGHBY claimed that over the Labor Day
weekend someone broke into his office at the police department.

176.   WILLOUGHBY contacted PISANI who called CID to investigate.

177.   By information or belief, CID's Burglary report stated that PISANI reported an
ongoing issue between WILLOUGHBY and the PLAINTIFFS.

178.   By information or belief, CID took crime scene photographs, including
photographs which show PLAINTIFFS sick leave logs on WILLOUGHBY's desk
indicating that WILLOUGHBY was probing PLAINTIFFS for abuse of the sick leave
program. Exhibit 6.

179.   There is nothing to indicate that such probing was well-founded or with any factual
cause.

180.   BRYDGES spoke with a detective from CID who advised him that
WILLOUGHBY gave a recorded statement implicating the PLAINTIFFS in the
burglary of his office.

**Willoughby Gave Direct Orders To Other Employees To Not Inform Plaintiffs Of Available Overtime During a Black Lives Matter March**

181.   On or about August 1st, 2020 a Black Lives Matter march took place within Ridley
Township.

182.   In preparation for the march and possible counter protest Ridley Township decided
to bring in extra officers on overtime to keep the peace.

183.   Prior to the event, all officers within the department, except for the Plaintiffs and LT. Hamill, were offered overtime by WILLOUGHBY to come in and support the event. Again, showing an intentional and coordinated effort to retaliate against the PLAINTIFFS.

184.   Willoughby manipulated department policy and department funds in a continued attempt to harm the PLAINTIFFS.

185.   Township Manager Joe Ryan, confirmed with Willoughby's secretary, Ian Cleghorn, that Willoughby gave direct orders not to include the Plaintiffs in the overtime. Ridley Township has been criticized by the public and the media for not having sufficient police presence during the march. Willoughby again placed his personal agenda above the effective discharge of his duties, the protection of the public and the good stewardship of public funds.

186.   This action is indicative of the larger pattern of denying the PLAINTIFFS overtime in an effort to retaliate regardless of the colleterial damage.

187.   Defendants, in their continual efforts to retaliate against the Plaintiffs kept three experienced and decorated officers off the streets during a large-scale protest and counter-protest that turned to a tense standoff with violent potential.

**Plaintiffs Are Demoted After the Township Comes Under Federal Investigation**

188.   On or about, December of 2020, by information or belief, Ridley Township's Tax Collector was alerted by Federal agents of an ongoing criminal investigation of Ridley Township officials.

189.   A short time later, the Ridley Township Tax Collector promptly resigned from his job.

190.    By information or belief, WILLERT blamed the PLAINTIFFS for providing information to initiate the federal investigation.

191.    By information or belief, WILLERT met with RYAN and decided to retaliate against the PLAINTIFFS, first by disbanding the Anti-Crime Unit and then by returning SCANLAN and BRYDGES to a patrol platoon.

192.    Before they could retaliate against the PLAINTIFFS, WILLERT and RYAN first needed to ensure they found a place for HAMILL to be reassigned, so that he would retain his rank once the Anti-Crime Unit was dismantled.

193.    Conversely, WILLERT, WILLOUGHBY and RYAN retaliated in a manner that precluded BRYDGES and SCANLIN from continuing in their roles as police detectives, and their roles in working with Delaware County Wide Drug Task Force and with Federal agencies.

194.    On or about January 24, 2021, Lieutenant Holmes of the Ridley Township Detective Division retired.

195.    On or about January 28, 2021, HAMILL met with WILLERT and RYAN who advised him that he was promoted to Lieutenant of the Detective Division.

196.    Upon Lieutenant Holmes retirement, the position was not posted for other officers to apply, it was immediately offered to HAMILL by WILLERT and RYAN.

197.    By information or belief, WILLERT did not advise the other Township Commissioners of his desire to make these personnel changes.

198.    WILLERT promoted HAMILL without notice the other Commissioners, advancing HAMILL quickly to retaliate against SCANLAN AND BRYDGES.

199.    WILLERT disregarded the Commission's policies and procedures, using his position as President of the Board of Commissioners to advance his retaliation against SCANLAN and BRYDGES. See, Exhibit 7, "The Ridley Codebook, Section 37-7."

200.    On or about January 28, 2021, by information or belief, WILLERT and RYAN, instructed HAMILL to disband the Anti-Crime Unit.

201.    SCANLAN and BRYDGES were members of the Anti-Crime Unit as detectives for the preceding seven years.

202.    Upon terminating the Anti-Crime Unit, HAMILL ordered SCANLAN and BRYDGES to return to the patrol division.

203.    By doing so, HAMILL demoted both SCANLAN and BRYDGES to the rank of patrolmen in violation of The Ridley Township Codebook. See, Exhibit 7.

204.    On January 29, 2021 at 3:50 pm, WILLOUGHBY distributed a directive restructuring the Ridley Police Department.  See attached, Exhibit 8, "Willoughby's Police Directive of January 29, 2021."

205.    On or about January 29, 2021, HAMILL instructs SCANLAN and BRYDGES to provide a copy of every job the Anti-Crime Unit conducted over the past seven years.

206.    In response, SCANLAN and BRYDGES print several hundred reports and provide them to HAMILL.

207.    By information or belief, RYAN told HAMILL to have the PLAINTIFFS provide these reports hoping to find discrepancies, overreporting of jobs or misinformation purposely used by the PLAINTIFFS to bolster the Anti-Crime Unit's success.

208.    By information or belief, when HAMILL tendered the reports to RYAN, RYAN seemed irritated, telling HAMILL "it was not what he was hoping for."

209.   RYAN then rejected the report tendered by the PLAINTIFFS.

210.   By information or belief, RYAN rejected the report because it failed to prove the Anti-Crime Unit was anything less than successful.

211.   On or about January 30, 2021, the Ridley Township Board of Commissioners attended a meeting and were advised of the changes in the Ridley Township Police Department days after the changes had been implemented.

212.   On that date, the Board of Commissioners learned of WILLERT and RYAN'S decision to disband the Anti-Crime Unit without advice from the Board.

213.   The Board of Commissioners learned that the Fraternal Order of Police, Lodge 27 condemned the order to disband the Anti-Crime Unit through social media posts.

214.   At this meeting, WILLERT told the Board of Commissioners that he "attempted to contact SCANLAN and BRYDGES" to discuss the changes but "they refused to meet with [WILLERT]."

215.   This allegation is entirely fabricated as WILLERT never reached out to contact SCANLAN or BRYDGES.

216.   Prior to becoming a Detective with the Anti-Crime Unit seven years ago, SCANLAN was a Corporal in the Patrol Division, now he has been demoted to a patrolman without any supervisory or investigatory role.

217.   BRYDGES is also now demoted to a patrolman without any supervisory or investigatory role.

218.   The DEFENDANTS seek to justify the PLAINTIFFS demotions in rank and pay as related to manpower issues and budget concerns.

219.    Notwithstanding, by information or belief, two patrol officers were promoted to detective at the same time SCANLAN and BRYDGES were demoted.

220.    When the DEFENDANTS learned that PLAINTIFFS had reported continuous violations of the law, misuse of funds and other wrongdoings to local and federal agencies, the DEFENDANTS acted in retaliation against SCANLAN and BRYDGES seeking to destroy their career, opportunity for income and reputation among other officers at Ridley Township Police Department.

221.    The DEFENDANTS conduct is severe and has caused and will continue to cause the PLAINTIFFS extreme damage to their reputations.

222.    As the result of Defendants' actions, Plaintiffs suffered injuries, including but not limited to emotional pain and suffering, emotional distress, the loss of income, and other continuing injuries the direct result of the Defendants' extreme and outrageous conduct and/or intent to cause or a disregard of a substantial probability of causing severe emotional distress.

        WHEREFORE,  Plaintiffs assert that the Defendants engaged in unlawful violations of Plaintiffs' rights both under state and federal laws, so much so as to merit compensatory damages, emotional damages, damages for physical harm, damages for lost wages, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

**AS A FIRST CAUSE OF ACTION**
**FOR RETALIATION AND HOSTILE WORK ENVIROMENT**
**IN VIOLATION OF THE FIRST AMENDMENT TO**
**THE UNITED STATES CONSTITUTION**
**Against All Defendants**

223.   Plaintiffs, incorporates herein, by reference thereto, the preceding paragraphs, as though the same were set forth herein at length.

224.   Plaintiffs complain of First Amendment Rights Violations of 42 U.S.C.S. § 2000(e).

225.   Plaintiffs are public employees, law enforcement officers, and their expressive conduct and speech is constitutionally protected:

226.   Plaintiffs' conduct and communication addressed a matter of public concern.

227.   Plaintiffs expression(s) were protected speech and outweighed the Defendants interest in the effective and efficient fulfillment of its responsibilities to the public.

228.   Plaintiffs content and circumstances are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community.

229.   At all relevant times, the Plaintiffs communications were protected by the First Amendment.

230.   At all relevant times, the Defendants knew or should have known that the Plaintiffs communications were protected by the First Amendment.

231.   At all relevant times, the PISANI and WILLERT were high ranking Ridley Township officials and had a duty to investigate WILLOUGHBY and stop his retaliation against the Plaintiffs.

232.   PISANI and WILLERT did nothing to stop WILLOUGHBY's retaliation against Plaintiffs.

233.   Defendants' actions and omissions "shock(s) the conscience," the acts were malicious, reckless, callous, retaliatory and deliberately indifferent against the Plaintiffs' for lawfully exercising their protected First Amendment rights.

234.  WILLOUGHBY retaliated against the Plaintiffs by intimidating them, harassing them, imposing unwarranted discipline against them, reducing or denying their work hours, affecting their wages and by seeking to discredit their police work.

235.  WILLOUGHBY'S other acts of retaliation against the Plaintiffs included restricting them from the use of necessary police equipment; revealing the identity of confidential informant in use by the Plaintiffs; threatening to post the identities of Plaintiffs (who are undercover police officers) in the local newspaper; accusing them of burglary and other numerous unlawful acts known and unknown to the Plaintiffs.

236.  WILLOUGHBY's intent was to pressure the Plaintiffs to quit.

237.  WILLOUGHBY's acts were constant, severe and punitive in nature, severe and/or pervasive and designed to create an abusive working environment.

238.  WILLOUGHBY's acts against the Plaintiffs served no legitimate purpose.

239.  PISANI and WILLERT's failure to act, misfeasance or malfeasance, purposeful conduct, punitive conduct was the direct and proximate cause of the injuries suffered by Plaintiffs for violation of their First Amendment rights.

240.  At all relevant times, the Defendants were acting under color of law and within the course of their official duties.

241.  Defendants jointly and severally conspired, aided and abetted to deprive and retaliate against Plaintiffs for asserting their constitutional rights.

242.  The Defendants are not entitled to qualified immunity for their actions and omissions.

WHEREFORE, the Plaintiffs assert that the Defendants engaged in unlawful violations of Plaintiffs' First Amendment Rights, to merit compensatory damages,

emotional damages, damages for physical harm, damages for lost wages, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

### AS A SECOND CAUSE OF ACTION
### FOR RETALITAION AND HOSTILE WORK ENVIRONMENT IN
### VIOLATION OF THE PENNSYLVANIA'S WHISTLEBLOWER ACT
### Against all Defendants

Section 1423 of Pennsylvania's Whistleblower Law provides:
"No employer may… retaliate…against an employee…because the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing… Pa. Stat.Ann. tit. 43, Section 1423(a); (b).

243.   Plaintiff, incorporates herein, by reference thereto, the preceding paragraphs, as though the same were set forth herein at length.

244.   Plaintiffs acted in "good faith" reporting unlawful acts and wrongdoings by WILLOUGHBY.

245.   At all relevant times, Plaintiffs reported WILLOUGHBY unlawful acts to PISANI and WILLERT.

246.   Plaintiffs reported WILLOUGHBY for violations of tampering with evidence, theft, interfering in active criminal investigations and prosecutions, and for abuse of power as a police official.

247.   Plaintiffs also reported other acts by WILLOUGHBY, such as lying to the Delaware County District Attorney's Office during an official prosecution, lying to neighboring police districts to have narcotics investigations withdrawn, and interfering with police investigations on several occasions.

248.   WILLOUGHBY violated criminal and civil laws, violated police procedure and his acts were against the public policy and violated Plaintiffs rights.

249. As a result, WILLOUGHBY retaliated against Plaintiffs, denying use of necessary police equipment, police staff, revealing the identity of their active confidential informant, threatening to expose Brydges identity, threatening Plaintiffs with physical assault and numerous other acts known and unknown to Plaintiffs.

250. WILLOUGHBY's retaliation against the Plaintiffs were punitive in nature, severe and pervasive, and designed to create an abusive working environment.

251. WILLOUGHBY's acts against the Plaintiffs served no legitimate purpose.

252. PISANI and WILLERT's failure to act, misfeasance or malfeasance, purposeful conduct, punitive conduct was the direct and proximate cause of the injuries suffered by Plaintiffs for reporting WILLOUGHBY's wrongdoing.

253. At all relevant times, the Defendants were acting under color of law and within the course of their official duties.

254. Defendants jointly and severally conspired, aided and abetted to deprive and retaliate against Plaintiffs for asserting their constitutional rights.

255. The Defendants are not entitled to qualified immunity for their actions and omissions.

256. WHEREFORE, the Plaintiffs assert that the Defendants engaged in unlawful violations against them, as to merit compensatory damages, emotional damages, damages for physical harm, damages for lost wages, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

### AS A THIRD CAUSE OF ACTION
### DEFAMATION (42 Pa. C.S.A. §8343)
### (aiding and abetting, civil conspiracy and retaliation)
### Against all Defendants

The defamation statute, 42 Pa.C.S.A. § 8343 (a) states:

In an action for defamation, the plaintiff has the burden of proving:
(1) The defamatory character of the communication.
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

257.   Plaintiff, incorporates herein, by reference thereto, the preceding paragraphs, as though the same were set forth herein at length.

258.   PISANI AND WILLERT at all relevant times were high ranking members of Ridley Township and its Police Department and were the appropriate authorities to receive Plaintiffs complaints.

259.   At all relevant times, Plaintiffs reported WILLOUGHBY's unlawful acts to PISANI and WILLERT.

260.   PISANI and WILLERT did not act to prevent WILLOUGHBY from publishing defamatory statement against the Plaintiffs.

261.   WILLOUGHBY provided highly offensive and unlawful statements which are a major misrepresentation of the Plaintiffs character, history, activities or beliefs.

262.   WILLOUGHBY was aware that the information he provided was false and acted deliberately to defame the Plaintiffs

263.   In one instance, in an official police report to CID, WILLOUGHBY, falsely accused Plaintiffs of burglarizing his office.

264.   WILLOUGHBY also recorded an audio statement for CID accusing the Plaintiffs of the burglary.

265.   WILLOUGHBY's defamatory statements are kept by CID and become part of the Plaintiffs' employment file.

266.   WILLOUGHBY also accused Plaintiffs of miscounting seized cash and back dated a supplemental police report blaming Plaintiffs for miscounting seized money.

267.   At all times WILLOUGHBY was aware that the information he provided was false and acted deliberately to defame the Plaintiffs.

268.   These reports were published to the Delaware District Attorney's Office, CID and are discoverable by the defense in any criminal case involving Plaintiffs.

269.   The defamatory reports are now part of the public record and will be heard by public citizens who attend court trials in which the PLAINTIFFS are called to testify.

270.   As the result of WILLOUGHBY's defaming, whenever PLAINTIFFS' are called to testify in a criminal case they are subject to false attacks against their credibility and character.

271.   WILLOUGHBY defamed and caused special harm to the Plaintiffs character and credibility as police officers working in the Ridley Township community.

272.   Future employers and other law enforcement agencies are potential recipients of these defamatory reports and can or will question the reputation, character and credibility of Plaintiffs.

273.   PISANI and WILLERT's failure to act, misfeasance or malfeasance, purposeful conduct, punitive conduct was a direct and a proximate cause of the injuries suffered by Plaintiffs for reporting WILLOUGHBY's wrongdoing.

274.   By information or belief, WILLOUGHBY also created, provided, stated, uttered and or maintained additional reports that defamed the Plaintiffs.

275.   At all relevant times, the Defendants were acting under color of law and within the course of their official duties.

276.   Defendants jointly and severally conspired, aided and abetted to deprive and retaliate against Plaintiffs for asserting their constitutional rights.

277.   The Defendants are not entitled to qualified immunity for their actions and omissions.

WHEREFORE, the Plaintiffs assert that the Defendants engaged in unlawful violations against them, as to merit compensatory damages, emotional damages, damages for physical harm,  damages for lost wages, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

## AS A FOURTH CAUSE OF ACTION
## INVASION OF PRIVACY—FALSE LIGHT
### Against all Defendants

The elements of false light invasion of privacy are as follows:
One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.
Publicity "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."
To be highly offensive to a reasonable person, "a major misrepresentation of a person's character, history, activities or beliefs is made that could reasonably be expected to cause a reasonable man to take serious offense."
Restatement (Second) of Torts § 625 E.

278.   Plaintiff, incorporates herein, by reference thereto, the preceding paragraphs, as though the same were set forth herein at length.

279.   Plaintiffs are decorated Ridley Township Police Officers.

280.   Plaintiffs have enjoyed a reputation of being honest, hardworking, and effective police officers in the law enforcement community.

281. Plaintiffs have never been "written up" or had any disciplinary action or warnings against them issued by the Ridley Township Police Department.

282. Moreover, Plaintiffs passed a rigorous screening process to work alongside the FBI.

283. WILLOUGHBY provided highly offensive statements which are major misrepresentation of the Plaintiffs character, reputation, competence and credibility.

284. WILLOUGHBY was aware that the information he provided was false and acted deliberately to have Plaintiffs viewed in a false light and to invade Plaintiffs privacy.

285. Plaintiffs allege that WILLOUGHBY's statements have been made public and have been communicated to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.

286. These falsities can be used as direct and/or impeachment evidence to attack Plaintiffs' police employment record(s), their reputation, competence, credibility, professional and personal character.

287. WILLOUGHBY's statements are highly offensive to a reasonable person, "a major misrepresentation" of the PLAINTIFFS reputation, character, competence, personal history, activities or beliefs which are reasonably justified to be expected to cause PLAINTIFFS to take serious offense.

288. WILLOUGHBY's communications and falsities against Plaintiffs are now subject to discovery requests from criminal defense attorney(s), criminal defendants, by the Delaware District Attorney's office, and the Ridley community in attendance at public trials where Plaintiffs are subject to examination.

289. At all relevant times, Plaintiffs reported WILLOUGHBY's unlawful acts to PISANI and WILLERT.

290. PISANI and WILLERT did not act to prevent, stop and/or discipline WILLOUGHBY.

291.   PISANI and WILLERT's had a duty to act to prevent WILLOUGHBY from deliberately harming the Plaintiffs.

292.   PISANI and WILLERT's misfeasance or malfeasance, purposeful conduct, negligent conduct was a direct and proximate cause of the injuries suffered by Plaintiffs.

293.   Defendants jointly and severally conspired, aided and abetted to deprive against the Plaintiffs.

294.   The Defendants are not entitled to qualified immunity for their actions and omissions.

295.   At all relevant times, the Defendants were acting under color of law and within the course of their official duties.

WHEREFORE, the Plaintiffs assert that the Defendants engaged in unlawful violations against them, as to merit compensatory damages, damages for physical harm, emotional damages, damages for lost wages, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

### AS A FIFTH CAUSE OF ACTION
### FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against all Defendants

Restatement (Second) of Torts Section 46:

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it, for such bodily harm. The standard for judging the existence of intent for infliction of emotional distress is whether the actor desires to inflict severe emotional distress and also where he knows that such distress is certain, or substantially certain, to result from his conduct. It applies also where he acts recklessly, in deliberate disregard of a high degree of probability that the emotional distress will follow. The Defendants conduct "…is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.  See, Restatement (Second) of Torts, Section 46, cmt. j (1965).

296.   Plaintiff, incorporates herein, by reference thereto, the preceding paragraphs, as though the same were set forth herein at length.

297.   WILLOUGHBY threatened Plaintiffs that he would reveal their identity as undercover narcotics officers by posting their picture in the local newspaper.

298.   Then, WILLOUGHBY threatened to expose BRYDGES, giving the pictures to his "niggers" on the streets.

299.   WILLOUGHBY stated that he wanted his "niggers" from Chester to "get them", meaning that he sought to have the PLAINTIFFS physically assaulted.

300.   Plaintiffs remain afraid of WILLOUGHBY's threats to hurt them.

301.   Plaintiffs reported WILLOUGHBY's threats to PISANI and WILLERT.

302.   PISANI and WILLERT had a duty to prevent, stop and/or discipline WILLOUGHBY for his threats against the Plaintiffs.

303.   PISANI and WILLERT never acted to investigate or discipline WILLOUGHBY for his acts of retaliation against the PLAINTIFFS.

304.   Instead, PISANI and WILLERT covered up WILLOUGHBY's retaliation and acts against the PLAINTIFFS.

305.   PISANI and WILLOUGHBY had duty of care to investigate WILLOUGHBY and seek disciplinary actions against him.

306.   PISANI and WILLERT's breach of duty was the result of misfeasance or malfeasance, purposeful conduct and negligence.

307.   PISANI and WILLERT's breach of duty was a direct and proximate cause of the physical and emotional injuries suffered by Plaintiffs.

308.   Defendants jointly and severally conspired, aided and abetted to deprive and retaliate against Plaintiffs for asserting their constitutional rights.

309.   The Defendants are not entitled to qualified immunity for their actions and omissions.

310.   At all relevant times, the Defendants were acting under color of law and within the course of their official duties.

311.   As the result of Defendants' actions, Plaintiffs suffered injuries, including but not limited to emotional pain and suffering, sleep deprivation, emotional distress, the loss of income, loss of consortium and other continuing injuries the direct result of the Defendants' conduct Plaintiffs continue to suffer traumatic emotional effects the result of the Defendants' acts.

WHEREFORE, the Plaintiffs assert that the Defendants engaged in unlawful violations against them, as to merit compensatory damages, emotional damages, damages for physical harm, damages for lost wages, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

## AS AN SIXTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### Against all Defendants

The tort of negligent infliction of emotional distress is negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care."

Under a basic negligence analysis, the elements of the tort of negligent infliction of emotional distress are established when: (a) defendant owed a duty of reasonable care to plaintiff; (b) defendant breached that duty; (c) plaintiff suffered severe emotional distress; and (d) defendant's breach of duty was the proximate cause of the injury.

312.   Plaintiff hereby incorporates the prior paragraphs as if the same were set forth fully here at length.

313.   Plaintiff, incorporates herein, by reference thereto, the preceding paragraphs, as though the same were set forth herein at length.

314.   WILLOUGHBY threatened Plaintiffs that he would reveal their identity as undercover narcotics officers by posting their pictures in the local newspaper.

315.   WILLOUGHBY threatened Plaintiffs that he would reveal their identity as undercover narcotics officers and release their identity to his "niggers" on the streets.

316.   WILLOUGHBY threatened Plaintiffs with physical assault, asserting that his "niggers" from Chester would "get them."

317.   As a result, BRYDGES lived in fear for his safety and that of his wife and young children.

318.   Plaintiffs were both afraid for their safety as active under-cover narcotics officer.

319.   Plaintiffs continue to live in fear of WILLOUGHBY and his disclosure of their undercover identities to the community.

320.   Plaintiffs reported WILLOUGHBY's statements to PISANI and WILLERT.

321.   PISANI and WILLERT had a duty of care to the Plaintiffs to prevent, stop and/or discipline WILLOUGHBY for his threats against the Plaintiffs.

322.   PISANI and WILLOUGHBY did nothing to stop WILLOUGHBY's threats against the Plaintiffs and breached their duty of care.

323.   PISANI and WILLERT's misfeasance or malfeasance, purposeful conduct and negligent conduct was a direct and proximate cause of the physical and emotional injuries suffered by Plaintiffs.

324.   WILLOUGHBY's threats were so egregious and outrageous in character, extreme in degree, as to go beyond all possible bounds of decency and intolerable in a civilized community.

325.   Defendants jointly and severally conspired, aided and abetted each other.

326.   The Defendants are not entitled to qualified immunity for their actions and omissions.

327.   At all relevant times, the Defendants were acting under color of law and within the course of their official duties.

328.   As the result of Defendants' actions, Plaintiffs suffered injuries, including but not limited to sever emotional pain and suffering, sleep deprivation, severe emotional distress, the loss of income, loss of consortium and other continuing injuries the direct result of the Defendants' conduct.

329.   Plaintiffs continue to suffer traumatic emotional effects the result of the Defendants' intentional acts.

330.   WHEREFORE, the Plaintiffs assert that the Defendants engaged in unlawful violations against them, as to merit compensatory damages, damages for physical harm, emotional damages, damages for lost wages, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

### AS A EIGHT CAUSE OF ACTION
### CIVIL AIDING AND ABETTING
### Against all Defendants

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

331.   Plaintiff, incorporates herein, by reference thereto, the preceding paragraphs, as though the same were set forth herein at length.

332.   Plaintiffs reported every retaliatory act against them by WILLOUGHBY to PISANI and WILLERT.

333.   PISANI and WILLERT had a duty to prevent, stop and/or discipline WILLOUGHBY for his threats against the Plaintiffs.

334.   PISANI and WILLERT worked in their official capacity to cover up WILLOUGHBY's unlawful conduct and retaliation against the Plaintiffs.

335.   PISANI and WILLERT, at a police meeting, denounced the Plaintiffs' complaints against WILLOUGHBY as unfounded.

336.   PISANI and WILLOUGHBY breached their duty of care.

337.   PISANI and WILLERT's breach of duty to the Plaintiffs resulted from their misfeasance or malfeasance, purposeful conduct and negligence.

338.   PISANI and WILLERT's breach of duty was a direct and proximate cause of some of the physical and emotional injuries suffered by Plaintiffs.

339.   Defendants jointly and severally aided and abetted to deprive and retaliate against Plaintiffs for asserting their constitutional rights.

340.   The Defendants are not entitled to qualified immunity for their actions and omissions within the course of their official duties.

WHEREFORE, the Plaintiffs assert that the Defendants engaged in unlawful violations of Plaintiffs' First Amendment Rights and other state laws and rights, so much so as to merit compensatory damages, damages for emotional harm, damages for physical harm, damages for lost wages, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

## **JURY DEMAND**

Plaintiff requests a jury trial.

## **<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and back pay and front pay, punitive damages, liquidated damages, compensatory damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

By:  */s/ Andres Jalon, Esquire*

Andres Jalon, Esq.
JALON & ASSOCIATES
17 W. Airy Street
Norristown, Pennsylvania 19401
ajalon@jalonesq.com

Dated: February 2nd, 2021