## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEAN BRYDGES and GERARD SCANLAN | : | |
| | : | |
| PLAINTIFFS, | : | |
| | : | |
| – vs. – | : | |
| | : | Civil Action |
| RIDLEY TOWNSHIP, SCOTT | : | |
| WILLOUGHBY, in his individual capacity, | : | No. 2:21-cv-00492 |
| EDWARD PISANI in his individual capacity | : | |
| ROBERT J. WILLERT in his individual | : | |
| capacity, and JOSEPH A. RYAN in his | : | |
| individual capacity, | : | |
| | : | |
| DEFENDANTS. | : | |

### PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Sean Brydges and Gerard Scanlan respectfully allege the following claims against the above-captioned Defendants.

### JURISDICTION AND VENUE

1.      This Court has 28 U.S.C. § 1331 federal-question jurisdiction and 28 U.S.C. §1343(a)(3) civil-rights jurisdiction over Plaintiffs' claims under 42 U.S.C. § 1983.

2.      This Court has 42 U.S.C. § 1367 supplemental jurisdiction over Plaintiffs' state-law claims.

3.      Plaintiffs are citizens of the Commonwealth of Pennsylvania residing within the Eastern District of Pennsylvania.

4.      Defendant Ridley Township is a political subdivision of the Commonwealth of Pennsylvania—particularly, a First-Class Township located in Delaware County, Pennsylvania, which is within the Eastern District of Pennsylvania.

5.      All other Defendants except for Edward Pisani are natural persons sued in their individual capacity who reside in the Eastern District of Pennsylvania.

6.     Edward Pisani is a natural person who resides at 3210 West Avenue, Ocean City, NJ 08226.

7.     This Court has personal jurisdiction over Edward Pisani because he took all relevant actions while in the Commonwealth of Pennsylvania.

8.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) even though Edward Pisani does not reside in the Eastern District of Pennsylvania because all of the events or omissions giving rise to Plaintiffs' claims occurred in the Eastern District of Pennsylvania.

PARTIES

9.     Plaintiff Sean Brydges ("BRYDGES") is a natural person who resides in Delaware County, Pennsylvania.

10.     At all relevant times BRYDGES was employed as a narcotics detective with Ridley's Township's Anti-Crime Unit, supervised by the defendants.

11.     Plaintiff, Gerard Scanlan ("SCANLAN") is a natural person who resides in Delaware County, Pennsylvania.

12.     At all relevant times SCANLAN was employed as a narcotics detective with Ridley's Township's Anti-Crime Unit, supervised by the defendants.

13.     Defendant, Ridley Township ("TOWNSHIP"), is township of the first class, whose principal governmental offices are located at 100 East MacDade Boulevard, Folsom, Pennsylvania 19033.

14.     Defendant Robert J. Willert ("WILLERT"), is a natural person employed as the Police Commissioner of the TOWNSHIP and as a Commissioner of Ridley Township, whose principal governmental offices are located at 100 East MacDade Boulevard, Folsom, Pennsylvania 19033.

15.     Defendant Scott Willoughby ("WILLOUGHBY") is a natural person employed as the Captain of the Ridley Township Police Department and, at all times material to this lawsuit, was PLAINTIFFS' direct supervisor.

16.     Defendant Edward Pisani ( "PISANI") is a natural person who was employed as the Ridley Township Manager, in an administrative position overseeing the governmental agencies of Ridley Township until February, 2020.

17.     After February 2020, PISANI was employed as the Ridley Township Public Safety Director in an administrative position overseeing the public safety services of the TOWNSHIP.

18.     Defendant, Joseph Ryan ("RYAN") is a natural person who is employed as the Ridley Township Manager, in an administrative position overseeing the governmental agencies of the TOWNSHIP.

<u>STATEMENT OF FACTS</u>

19.     At all relevant times, PISANI and WILLERT were high ranking Ridley Township officials who received complaints of corruption occurring with the police.

20.     On or about 2014, WILLOUGHBY handed PLAINTIFFS $8.000.00 in cash and ordered them to repackage it with evidence that contained seized cash from a prior narcotics arrest.

21.     WILLOUGHBY was trying to impede an active criminal investigation conducted by the Criminal Investigation Division ("CID") of missing cash funds and property.

22.     CID was actively investigating a Delaware County employee, Mary Lynch, for a monetary theft from a Ridley Township narcotics case.

23.     As part of the investigation, CID sought to interview PLAINTIFFS regarding evidence tampering and theft of proceeds from a drug case that PLAINTIFFS initiated.

24.     CID believed that the thefts and tampering were committed by Mary Lynch, a secretary employed by Delaware County District Attorney's office,

25.     By information or belief, WILLOUGHBY was concerned that CID was going to investigate the evidence room and that he could be charged with several crimes.

26.     By information or belief, WILLOUGHBY would remove cash seized from narcotics arrest and then later replace it with cash seized from new narcotics arrests.

27.     The drug arrests were primarily made by the Anti-Crime Unit, which PLAINTIFFS ran.

28.     When PLAINTIFFS reported WILLOUGHBY to PISANI, PISANI advised them that their report would be confidential, that WILLOUGHBY would not find out who made the report against him.

29.     Almost immediately after PLAINTIFFS first report to PISANI, WILLOUGHBY began retaliating against PLAINTIFFS.

30.     WILLOUGHBY retaliated against PLAINTIFFS by intimidating them, harassing them, imposing unwarranted discipline against them, reducing or denying them their work hours, affecting their wages, seeking to discredit their police work, defaming them to other police officers and to the community, restricting them from the use of necessary police equipment, revealing the identity of a confidential informant that PLAINTIFFS used, threatening to post the identities of PLAINTIFFS (who are undercover police officers) in the newspaper, accusing them of burglary, and other numerous unlawful acts known and unknown to PLAINTIFFS.

31.     For the next few years, PLAINTIFFS reported every incident of WILLOUGHBY's retaliation against them to PISANI and WILLERT.

32.     Since 2014, WILLOUGHBY has continuously retaliated against PLAINTIFFS.

33.     PISANI and WILLERT failed to act to stop WILLOUGHBY's retaliation.

**The 2014 through 2016 investigation by Ridley Township's Criminal Investigation Division (CID) of Ridley Township's Police Evidence Room.**

34.     BRYDGES and SCANLAN were employed by the Ridley Township Police as the only two narcotics detectives actively engaged in drug investigations as members of the Anti-Crime Unit.

35.     In the course of their employment, PLAINTIFFS made numerous narcotics arrests often seizing large quantities of drugs and cash.

36.     After these arrests, PLAINTIFFS' recorded all property seizures as evidence, duly marking and packaging the evidence and cataloging the cash by denomination.

37.     Cash seizures would then be placed in a secure evidence envelope and held in the Ridley Police Evidence Room until the arrested defendant's trial or conviction.

38.     After any conviction, the seized money would be received by the Delaware County Forfeiture Unit.

39.      On or about the end of year 2014, DEFENDANTS were notified that CID was investigating seized cash held in the evidence room.

40.      A CID audit and inventory of the confiscated cash and evidence was imminent.

41.     Prior to CID's audit, WILLOUGHBY ordered PLAINTIFFS to re-package $8,000.00, which had been confiscated and recorded into evidence as part of a drug arrests.

42.     PLAINTIFFS questioned why WILLOUGHBY ordered them to re-package evidence since it had already been counted, recorded, and submitted to the Evidence Room.

43.     PLAINTIFFS knew that, by re-packaging the evidence, the "chain of custody" would be broken, which would negatively impact the prosecution of the criminal case.

44.     WILLOUGHBY admonished PLAINTIFFS for questioning him and again ordered them to re-package the money.

45.     When PLAINTIFFS looked at the sealed evidence-bags, they realized that the bags had been tampered with.

46.     PLAINTIFFS realized that the bills that were in evidence bags were not the same as what they had seized; the evidence bags had been re-packaged.

**PLAINTIFFS try to address their concerns with PISANI and WILLERT.**

47.     PLAINTIFFS immediately notified Ridley Township's manager, PISANI who advised them that he would notify Police Commissioner WILLERT.

48.     PLAINTIFFS met with PISANI and WILLERT to explain the incident in person.

49.     At the meeting, PLAINTIFFS expressed concerns because WILLOUGHBY was their "boss" and, if he became aware of their report, he would retaliate against them.

50.     PISANI and WILLERT reassured Plaintiffs that no one would be aware of the report.

**Two days after the report, WILLOUGHBY begins to retaliate against them.**

51.     By information or belief, PISANI told WILLOUGHBY about PLAINTIFFS' report to PISANI.

52.     WILLOUGHBY seemed irate and angry at PLAINTIFFS two days after they made their report to PISANI and WILLERT.

53.     First, WILLOUGHBY denied PLAINTIFFS' the use of a "take home vehicle" regularly driven by them to conduct drug investigations.

54.     The bulletin denying PLAINTIFFS use of a take-home vehicle is attached hereto as Exhibit 1.

55.     PLAINTIFFS immediately reported WILLOUGHBY'S refusal to allow PLAINTIFFS access to the "take home" vehicles to WILLERT and PISANI.

56.     The next day, WILLERT approved the use of the "take home" vehicle.

57.     WILLERT's approval of the vehicles seemed to anger WILLOUGHBY even more.

**The unlawful hinderance by Willoughby and Pisani of an investigation by the Delaware County Drug Task Force and Pennsylvania Liquor Control Board Investigation (February 2016).**

58.     WILLOUGHBY instructed PLAINTIFFS to assist the Delaware County Drug Task Force and the Pennsylvania State Liquor Control Enforcement to coordinate upcoming raids on nuisance bars.

59.     In about February 2016, the Anti-Crime Unit was asked to change their schedule to assist with nuisance bar complaints at the RS Club located at 1936 W. MacDade Boulevard, Woodlyn, Pennsylvania.

60.     On or about February 20, 2016, SCANLAN conducted a large roll call with approximately 50 officers present, all members of law enforcement organizations.

61.     The liquor raid continued as planned.

62.     When RS Club was targeted and law enforcement arrived, there were very few patrons in the bar at a time where there would generally be a large number of patrons.

63.     PLAINTIFFS noticed WILLOUGHBY acting in a strange manner during the raid.

64.     PLAINTIFFS advised PISANI that it was their opinion that someone tipped off the owner of the RS Club.

65.     PISANI agreed that WILLOUGHBY was acting strange and that he was patrolling everywhere in town but where the detail was.

66.     The following week, PISANI told PLAINTIFFS that he reviewed phone calls from WILLOUGHBY's office and discovered calls to the owner of the RS Club Bar, prior to the liquor raid.

67.     PLAINTIFFS demanded that PISANI report this discovery to WILLERT and to begin an immediate investigation of WILLOUGHBY.

68.     By information or belief, PISANI did not investigate WILLOUGHBY.

69.     By information or belief, WILLOUGHBY learned of PLAINTIFFS' report to PISANI from PISANI.

**Willoughby's cover up of missing cash ($1,000.00) from Case No. CP-23-CR-0000860-2015 by unlawfully ordering to create and "back date" a supplemental report**

70.     On or about May 2016, PLAINTIFFS were notified that the Delaware County District Attorney's office requested $28,711.00 (cash), the amount seized from case CP-23-CR-0000860-2015, since the case resulted in a conviction.

71.     The relevant section of the incident report is attached hereto as Exhibit 2.

72.     Sergeant Henderson ("HENDERSON") an PISANI notified PLAINTIFFS that there was only $27,711.00 in evidence from the arrest.

73.     The funds were $1,000.00 short.

74.     All evidentiary records, including pictures from the Anti-Crime Unit attached hereto as Exhibit 3, verified that the amount seized by PLAINTIFFS was $28,711.00 and that it had been placed in evidence more than a year prior.

75.     WILLOUGHBY had taken the missing money and later asked PISANI to take $1,000.00 from the Police General Fund to replace it.

76.     PISANI refused WILLOUGHBY'S request.

77.     WILLOUGHBY then ordered HENDERSON to write and "back date" a supplemental report and attach it to the original evidence collection report. *See* Exhibit 2.

78.     At WILLOUGHBY's direction, HENDERSON wrote the supplemental report, "back dated" it, and attached it to the original evidence collection report. *See* Exhibit 2.

79.     The supplemental report falsely stated that PLAINTIFFS miscounted the seized money. *See* Exhibit 2.


**Willoughby's attempt to "under report" the Anti-Crime Unit arrests (June 2016).**

80.     On or about June 1, 2016, WILLOUGHBY ordered a corporal under his command to access the Anti-Crime Unit's database and change the records to "under report" the number of arrests by PLAINTIFFS and the Anti-Crime Unit.

81.     WILLOUGHBY's wanted to discredit PLAINTIFFS at a future meeting with WILLERT.

82.     At the meeting, WILLOUGHBY insisted to WILLERT that PLAINTIFFS over-reported their arrests to exaggerate the unit's success.

83.     On June 9, 2019, PISANI sent the Anti-Crime Unit a group text requesting PLAINTIFFS' presence at a meeting with WILLERT that same morning at 7:15 am.

– 9 –

84.     PLAINTIFFS were instructed to bring their arrest reports, statistics and they were advised that new rules in reporting arrests were to be implemented.

85.     Prior to the meeting, WILLOUGHBY accused PLAINTIFFS of over-reporting their narcotics arrests.

86.     PLAINTIFFS denied WILLOUGHBY'S accusations to WILLERT.

**Willoughby's continued efforts to undermine the Anti-Crime Unit (June 2016).**

87.     On or about June 15, 2016, Assistant District Attorney Brian Doherty ("DOHERTY") requested all evidence, on a specific case, be sent to the County Courthouse Evidence Room for a trial on Wednesday, June 22, 2016.

88.     As per police procedure, immediately after the arrest of the defendant to be tried, PLAINTIFFS had inventoried and recorded the confiscated evidence and submitted it to the evidence room.

89.     One of the pieces of evidence was a pink and black handgun.

90.     On June 16, 2016, this evidence was turned over to the Delaware County Courthouse Evidence Room.

91.     The pink and black handgun went missing.

92.     Late in the afternoon on June 16, 2016, DOUGHERTY notified PLAINTIFFS that the gun was not turned over to the Delaware County Courthouse Evidence Room.

93.     PLAINTIFFS did not have access to the Ridley Township evidence room and they knew the criminal prosecution of the case would be affected if they didn't find the gun.

94.     PLAINTIFFS notified PISANI of the missing handgun at 8:00 a.m. on Monday, June 20, 2016.

– 10 –

95.     PLAINTIFFS notified PISANI of their belief that the missing handgun had been removed from the evidence room by someone with access.

96.     By information or belief, PISANI contacted WILLOUGHBY at 8:30 a.m. on the same day.

97.     The gun was found an hour later.

98.     On information or belief, WILLOUGHBY took the gun from the Evidence Room and returned it when PISANI called him.

### Willoughby ordered Officer Borak not to assist the Anti-Crime Unit in transporting evidence to the State Lab or Delaware County Courthouse.

99.     On that same day, after the gun was found, Sergeant Palo ("PALO") left a note in PLAINTIFFS' office stating that Officer Borak ("BORAK") was ordered not to bring the missing gun to the Delaware County Courthouse.

100.    At that time, BORAK's job assignment was to transport evidence of criminal cases to the Delaware County Courthouse Evidence Room.

101.    The chain of custody paperwork in the case folder had a white label over BORAK's name for an Anti-Crime Unit member to fill it out.

102.    BORAK was anticipated to be part of the "chain of custody" as he was in all other criminal cases.

103.    As PLAINTIFFS were leaving to take the handgun to the Courthouse, they encountered BORAK.

104.    BORAK told PLAINTIFFS that WILLOUGHBY and PALO ordered BORAK *not* to transport the handgun even though he was on his way there.

– 11 –

105.    WILLOUGHBY and PALO also instructed BORAK that from that day forth he was *not* to take any of PLAINTIFFS' evidence to the Courthouse.

106.    On or about Monday, August 8, 2016, the Anti-Crime Unit made two more narcotics arrests and completed the requisite evidence report and request for a lab report.

107.    BORAK was to transfer the seized narcotics to the State Police Lab.

108.    BORAK's official duties also included transporting all seized narcotics from arrests to the Pennsylvania State Police Lab.

109.    By information or belief, WILLOUGHBY also ordered BORAK not to transport any narcotics that PLAINTIFFS confiscated to the lab.

110.    On or about Tuesday, August 9, 2016, WILLOUGHBY ordered BORAK to no longer complete the case folders in any arrests made by PLAINTIFFS.

111.    By information or belief, WILLOUGHBY wanted to ensure PLAINTIFFS would not receive assistance or support from any member of the POLICE.

**The Prison Tapes (August 2016)**

112.    On or about August 4, 2016, PLAINTIFFS listened to prison phone-call tapes.

113.     The conversations were between a subject named James Curtain ("CURTAIN") who was in Delaware County Prison and a non-inmate Mike Melagrano ("MELAGRANO").

114.    MELAGRANO and CURTAIN discussed confidential information about PLAINTIFFS, triggering safety concerns for PLAINTIFFS.

**Willoughby orders Plaintiffs to lie to Assistant District Attorney McKenna and to the Haverford Township Police.**

115.    On or about August 2017, WILLOUGHBY ordered PLAINTIFFS to lie to Delaware County, Deputy District Attorney McKenna ("MCKENNA") that a defendant, William Haney ("HANEY"), cooperated with them as a confidential informant.

116.    WILLOUGHBY told PLAINTIFFS to tell MCKENNA that HANEY provided them with important narcotics intelligence, so that MCKENNA would withdraw the charges against HANEY.

117.    PLAINTIFFS told MCKENNA that WILLOUGHBY had ordered them to lie.

118.    By information or belief, HANEY was employed by WILLOUGHBY's personal friend, Paul Cloud ("CLOUD").

119.    WILLOUGHBY told PLAINTIFFS that he promised CLOUD to get HANEY out of trouble in exchange for the work that CLOUD had done at his home.

120.    PLAINTIFFS refused to lie to MCKENNA.


**Plaintiffs are ordered to lie to the Haverford Township Police Narcotics Unit.**

121.    In about February 2018, WILLOUGHBY called PLAINTIFFS to ask to for help to get his daughter's juvenile boyfriend out of trouble with the Haverford Township Police Narcotics Unit.

122.    The juvenile had been arrested for marijuana possession.

123.    WILLOUGHBY instructed PLAINTIFFS to say that the juvenile provided drug information to the Ridley Township Police Narcotics Unit.

124.    PLAINTIFFS reported to Lt. Hamill of the Ridley Township Police ("HAMILL") that WILLOUGHBY wanted them to lie to the Haverford Township Police Narcotics Unit.

– 13 –

125.    SCANLAN refused to lie to the Haverford Township Police Narcotics Unit.

126.    WILLOUGHBY told PLAINTIFFS days later that he had an argument with MCKENNA and a Havertown Police Administrator regarding his attempt to have PLAINTIFFS provide them with misinformation.

127.    WILLOUGHBY was angry with PLAINTIFFS for their failure to cooperate.

**Willoughby reveals the identity of the confidential informant.**

128.    At the end of February 2018, BRYDGES arrested a defendant ("Defendant X") for narcotics violations and seized over $237,000 in illicit proceeds.

129.    The confidential informant who worked with BRYDGES provided substantial assistance resulting in the arrest and seizure of Defendant X.

130.    To protect the confidential informant's identity, BRYDGES obtained a sealed search warrant.

131.    WILLOUGHBY made clear on several prior occasions that he wanted to get at BRYDGES and SCANLAN and to shut down the Anti-Crime Unit.

132.    On or about March 13, 2018, BRYDGES received a call from a Chester Narcotic police officer stating he received a call from the Defendant X's criminal defense attorney claiming he knew the identity of the confidential informant.

133.    PLAINTIFFS, WILLOUGHBY, a Chester Narcotics Officer, and a DEA Agent were the only law enforcement officers who knew the confidential informant's identity.

134.    The search warrant was still sealed at this time and accessible only to law enforcement.

135.    On or about March 12, 2018, WILLOUGHBY openly stated that he knew the identity of the confidential informant.

136.    By information and belief, WILLOUGHBY, who was close friends with the defense attorney, revealed the confidential informant's identity to said attorney.

137.    On or about April 2018, Major Gretsky ("GRETSKY") from the Chester Police Department was working at Liberty's Tavern in the Woodlyn section of Ridley Township.

138.    By information or belief, WILLOUGHBY sent PALO there by WILLOUGHBY since he was banned from communicating with Chester Police officers.

139.    A short time later, WILLOUGHBY told GRETSKY not to call PLAINTIFFS to assist them in handling drug cases and arrests because he didn't want PLAINTIFFS to earn overtime.

140.    The following week, WILLOUGHBY sent GRETSKY a text message stating that "I thought I told you not to invite the Anti-Crime Unit" to Chester for overtime work.

141.    In response, GRETSKY told WILLOUGHBY that his brother was in charge of the drug unit and would invite the Anti-Crime Unit to work whenever he wants.

142.    WILLOUGHBY responded to GRETSKY that he had nothing but time on his side and he will "get them guys."

143.    PLAINTIFFS notified HAMILL of WILLOUGHBY'S constant retaliation.

144.    HAMILL acknowledged that he was already aware of the situation and stated that WILLOUGHBY told him that he was looking to "get us."

145.    PLAINTIFFS again notified PISANI of the WILLOUGHBY's threats.

146.    On or about April 27, 2018, BRYDGES approached WILLOUGHBY and asked him to stop saying that he was going to "get them," and to stop threatening to replace them by offering PLAINTIFFS' jobs to other officers.

147.     WILLOUGHBY became irate and stated screaming, "Oh, I'm gonna get both of you!"

148.     WILLOUGHBY told BRYDGES that he was working on getting rid of the Anti-Crime Unit and demoting PLAINTIFFS.

149.     WILLOUGHBY's acts were in retaliation for the reports of his unlawful acts made by PLAINTIFFS to WILLERT and PISANI.

**Willoughby threatens to reveal Officer Brydges' identity to jeopardize his safety.**

150.     On or about May 3, 2018, BRYDGES received a call from a Chester City Police Detective regarding a conversation he had with WILLOUGHBY.

151.     The Chester City Detective advised BRYDGES that he was in WILLOUGHBY's office doing paperwork the previous week.

152.     WILLOUGHBY stated to him that he was going to post a picture of BRYDGES in the newspaper so he could no longer work undercover in the county.

153.     WILLOUGHBY told him, "he was going to get the pictures of PLAINTIFFS from Facebook and hand them out to his "niggers."

154.     WILLOUGHBY said he wanted his "niggers" from Chester to get the PLAINTIFFS.

155.     The Chester City Detective then said that WILLOUGHBY said he knows this is a safety issue and wanted to make sure the Chester guys were alright with doing this.

156.     PLAINTIFFS believe that WILLOUGHBY was discussing physical assaults by the "Chester guys" against them.

157.     PLAINTIFFS then met with HAMILL who again described the conversation with WILLOUGHBY where he said he was going to get "them guys."

– 16 –

158.    HAMILL asserted that he told PISANI about WILLOUGHBY's threats.

159.    BRYDGES believed that WILLOUGHBY would follow through with his threats and he was worried about the safety of his wife and children.

160.    On or about May 12, 2018, BRYDGES purchased security cameras for his house after learning of WILLOUGHBY'S threats against him and SCANLAN.

161.    On or about Thursday, May 24, 2018, PLAINTIFFS met with PISANI and WILLERT who stated that they spoke to WILLOUGHBY and he admitted making threats against PLAINTIFFS.

162.    PLAINTIFFS complained to PISANI and WILLERT that WILLOUGHBY's retaliatory acts were abusive and emotionally damaging and they felt unsafe at work.

163.    PLAINTIFFS advised that they felt it was impossible to continue working in those conditions and asked PISANI and WILLERT to conduct a detailed investigation.

164.    PISANI and WILLERT agreed and said they would look into moving the Anti-Crime Unit's office away from the police department.

165.    PISANI and WILLERT suggested that PLAINTIFFS take off from work if they needed to stay away from the hostile work environment that WILLOUGHBY created.

166.    By information or belief, sometime later, after Ridley Township Police meeting, WILLERT and PISANI advised the sergeants in attendance that PLAINTIFFS's claims about WILLOUGHBY were un-substantiated.

### Willoughby's denial of Plaintiffs' overtime.

167.    On or about the week of July 22, 2019, PLAINTIFFS spent the week testifying at the Delaware County Courthouse in Media.

– 17 –

168.    PLAINTIFFS submitted overtime and compensation time hours for payment of time accrued from being at the courthouse during the trial.

169.    The overtime was first approved on July 26, 2019, but WILLOUGHBY later unapproved it.

170.    The time-card records showing this action are attached hereto as Exhibit 4.

171.    PLAINTIFFS filed an official grievance with Fraternal Order of Police against WILLOUBHBY and challenged his denial of their overtime and comp time.

172.    The request for legal aid through the Fraternal Order of Police is attached hereto as Exhibit 5.

173.    On or about Thursday, August 1, 2019, PLAINTIFFS spoke to PISANI who once again agreed that WILLOUGHBY was harassing them because the Anti-Crime Unit was successful in securing a conviction the week before.

174.    On that same date, PLAINTIFFS provided PISANI a letter regarding the overtime hours that were first approved that WILLOUGHBY later denied.

175.    In their letter, the PLAINTIFF'S referred to prior emails regarding WILLOUGHBY's retaliation against them, which PISANI and WILLERT ignored.

176.    WILLOUGHBY wanted the Anti-Crime Unit to fail so he could continue to harass and retaliate against PLAINTIFFS for reporting his unlawful acts.

177.    WILLOUGHBY wanted to deny PLAINTIFFS overtime and eventually remove them from the Anti-Crime Unit and demote them.

178.    A short time later, PISANI contacted PLAINTIFFS and advised that they would be paid for all their overtime.

179.    PISANI also advised that he would speak to WILLERT to end WILLOUGHBY'S retaliation against PLAINTIFFS.

180.    On or about August 5, 2019, PISANI approved PLAINTIFF'S compensatory time and overtime, overruling WILLOUGHBY's denial.

**Investigation for Burglary of Willoughby's Office names Plaintiffs as suspects.**

181.    On or about September 4, 2019, WILLOUGHBY claimed that, over the Labor Day weekend, someone broke into his office at the police department.

182.    WILLOUGHBY contacted PISANI.

183.    PISANI called CID to investigate.

184.    CID investigated.

185.    By information or belief, CID's investigative report stated that PISANI reported an ongoing issue between WILLOUGHBY and PLAINTIFFS.

186.    By information or belief, CID took crime scene photographs, including photographs which show PLAINTIFFS sick-leave logs on WILLOUGHBY's desk.

187.    The presence of the sick-leave logs on WILLOUGHBY's desk indicates that he was probing PLAINTIFFS for abuse of the sick leave program. *See.* Exhibit 6.

188.    There is nothing to indicate that such probing was well-founded or had any factual basis.

189.    BRYDGES spoke with a CID detective who advised him that WILLOUGHBY gave a recorded statement falsely implicating PLAINTIFFS in the burglary of his office.

**Willoughby ordered Ridley Township Police Officers not to inform Plaintiffs of Available Overtime During a Black Lives Matter March**

190.    On or about August 1, 2020, a Black Lives Matter march took place within Ridley Township.

191.    In preparation for the march and possible counter protest, the TOWNSHIP decided to bring in extra officers on overtime to keep the peace.

192.    Prior to the event, WILLOUGHBY offered all officers within the department except for PLAINTIFFS and LT. Hamill, overtime to keep the peace.

193.    WILLOUGHBY's failure to offer PLAINTIFFS overtime shows an intentional and coordinated effort to retaliate against PLAINTIFFS.

194.    WILLOUGHBY manipulated department policy and department funds in a continued attempt to harm PLAINTIFFS.

195.    Township Manager Joe Ryan confirmed with WILLOUGHBY's secretary, Ian Cleghorn, that WILLOUGHBY gave direct orders not to include PLAINTIFFS in the overtime.

196.    Ridley Township has been criticized by the public and the media for not having sufficient police presence during the march.

197.    Even so, WILLOUGHBY again placed his personal agenda above the effective discharge of his duties, the protection of the public, and the good stewardship of public funds.

198.    This action is indicative of the larger pattern of denying PLAINTIFFS overtime in an effort to retaliate regardless of the colleterial damage.

199.    DEFENDANTS, in their continual efforts to retaliate against PLAINTIFFS, kept three experienced and decorated officers off the streets during a large-scale protest and counter-protest that turned to a tense standoff with violent potential.

**Plaintiffs Are Demoted After the Township Comes Under Federal Investigation**

200.    In about December of 2020, by information or belief, federal agents alerted Ridley Township's Tax Collector of an ongoing criminal investigation of Ridley Township officials.

201.    A short time later, the Ridley Township Tax Collector resigned from her job.

202.    By information or belief, WILLERT blamed PLAINTIFFS for providing information to initiate the federal investigation.

203.    By information or belief, WILLERT met with RYAN and decided to retaliate against PLAINTIFFS, first by disbanding the Anti-Crime Unit and then by returning SCANLAN and BRYDGES to a patrol platoon.

204.    Before they could retaliate against PLAINTIFFS, WILLERT and RYAN first needed to ensure they found a place for HAMILL to be reassigned, so that he would retain his rank once the Anti-Crime Unit was dismantled.

205.    Conversely, WILLERT, WILLOUGHBY and RYAN retaliated in a manner that precluded BRYDGES and SCANLIN from continuing in their roles as police detectives, and their roles in working with Delaware County Wide Drug Task Force and with Federal agencies.

206.    On or about January 24, 2021, Lieutenant Holmes of the Ridley Township Detective Division retired.

207.    On or about January 28, 2021, HAMILL met with WILLERT and RYAN who advised him that he was promoted to Lieutenant of the Detective Division.

208.    Upon Lieutenant Holmes' retirement, the position was not posted for other officers to apply; instead, WILLERT and RYAN immediately offered it to HAMILL.

209.    By information or belief, WILLERT did not advise the other Township Commissioners of his desire to make these personnel changes.

210.    WILLERT promoted HAMILL without notice to the other Commissioners, advancing HAMILL quickly to retaliate against SCANLAN AND BRYDGES.

211.    WILLERT disregarded the Commission's policies and procedures, using his position as President of the Board of Commissioners to advance his retaliation against SCANLAN and BRYDGES. *See* Exhibit 7, "The Ridley Codebook, Section 37-7."

212.    On or about January 28, 2021, by information or belief, WILLERT and RYAN instructed HAMILL to disband the Anti-Crime Unit.

213.    SCANLAN and BRYDGES were members of the Anti-Crime Unit as detectives for the preceding seven years.

214.    Upon terminating the Anti-Crime Unit, HAMILL ordered SCANLAN and BRYDGES to return to the patrol division.

215.    By doing so, HAMILL demoted both SCANLAN and BRYDGES to the rank of patrolmen in violation of The Ridley Township Codebook. See, Exhibit 7.

216.    On January 29, 2021 at 3:50 pm, WILLOUGHBY distributed a directive restructuring the Ridley Police Department. See attached, Exhibit 8, "Willoughby's Police Directive of January 29, 2021."

217.    On or about January 29, 2021, HAMILL instructed SCANLAN and BRYDGES to provide a copy of every job the Anti-Crime Unit conducted over the past seven years.

218.    In response, SCANLAN and BRYDGES printed several hundred reports and provide them to HAMILL.

219.    By information or belief, RYAN told HAMILL to have PLAINTIFFS provide these reports hoping to find discrepancies, overreporting of jobs, or misinformation supposedly used by PLAINTIFFS to bolster the Anti-Crime Unit's success.

220.    By information or belief, when HAMILL tendered the reports to RYAN, RYAN seemed irritated, telling HAMILL "it was not what he was hoping for."

221.    RYAN then rejected the report that PLAINTIFFS tendered.

222.    By information or belief, RYAN rejected the report because it failed to prove the Anti-Crime Unit was anything less than successful.

223.    On or about January 30, 2021, the Ridley Township Board of Commissioners attended a meeting and were advised of the changes in the Ridley Township Police Department days after the changes had been implemented.

224.    On that date, the Board of Commissioners learned of WILLERT and RYAN'S decision to disband the Anti-Crime Unit without advice from the Board.

225.    The Board of Commissioners learned that the Fraternal Order of Police, Lodge 27 condemned the order to disband the Anti-Crime Unit through social media posts.

226.    At this meeting, WILLERT told the Board of Commissioners that he "attempted to contact SCANLAN and BRYDGES" to discuss the changes but "they refused to meet with [WILLERT]."

227.    This allegation is entirely fabricated.

228.    WILLERT never reached out to contact SCANLAN or BRYDGES.

229.    Prior to becoming a Detective with the Anti-Crime Unit seven years ago, SCANLAN was a Corporal in the Patrol Division; he has now been demoted to a patrolman without any supervisory or investigatory role.

230.    BRYDGES has also now been demoted to a patrolman without any supervisory or investigatory role.

231.    The DEFENDANTS seek to justify PLAINTIFFS demotions in rank and pay as related to manpower issues and budget concerns.

232.    Notwithstanding that, by information or belief, two patrol officers were promoted to detective at the same time SCANLAN and BRYDGES were demoted.

233.    When the DEFENDANTS learned that PLAINTIFFS had reported continuous violations of the law, misuse of funds and other wrongdoings to local and federal agencies, the DEFENDANTS acted in retaliation against SCANLAN and BRYDGES seeking to destroy their career, opportunity for income, and reputation among other officers at Ridley Township Police Department.

234.    DEFENDANTS' conduct is severe and has caused and will continue to cause PLAINTIFFS extreme damage to their reputations.

235.    As the result of Defendants' actions, Plaintiffs suffered injuries, including but not limited to emotional pain and suffering, emotional distress, the loss of income, and other continuing injuries as the direct result of the Defendants' conduct.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 (First Amendment)**
**Plaintiffs vs. Scott Willoughby, Edward Pisani, Robert J. Willert, and Joseph Ryan**

236.    PLAINTIFFS incorporate the preceding paragraphs as though the same were set forth herein at length.

237.    DEFENDANTS violated Plaintiffs' rights under the First Amendment of the Constitution of the United States, and so violated 42 U.S.C. § 1983.

238.    In reporting misconduct, PLAINTIFFS spoke as citizens.

239.    PLAINTIFFS' statements involved a matter of public concern.

240.    DEFENDANTS did not have an adequate justification for treating PLAINTIFFS differently from any other member of the general public just because PLAINTIFFS reported misconduct.

241.    WILLOUGHBY retaliated against PLAINTIFFS for their protected speech by, among other things, intimidating them, harassing them, imposing unwarranted discipline against them, reducing or denying their work hours, affecting their wages, seeking to discredit their police work, restricting them from the use of necessary police equipment, revealing the identity of PLAINTIFFS' confidential informant, threatening to post PLAINTIFF's identities of Plaintiffs in the local newspaper, accusing them of burglary, and other numerous unlawful acts known and unknown to PLAINTIFFS.

242.    RYAN demoted PLAINTIFFS for their protected speech.

243.    At all relevant times, RYAN, PISANI, and WILLERT were high-ranking Ridley Township officials but failed to investigate WILLOUGHBY and stop his retaliation against PLAINTIFFS because of PLAINTIFFS' protected speech.

244.    PISANI, RYAN, and WILLERT's failure to act, misfeasance or malfeasance, purposeful and punitive conduct was a direct and proximate cause of the injuries that PLAINTIFFS suffered.

245.    At all relevant times, DEFENDANTS knew or should have known that the First Amendment protected PLAINTIFFS' communications.

246.    DEFENDANTS' actions and omissions shock the conscience and were malicious, reckless, callous, retaliatory, and deliberately indifferent to PLAINTIFFS' First Amendment rights.

247.    At all relevant times, DEFENDANTS were acting under color of law.

WHEREFORE, PLAINTIFFS request compensatory damages, damages for lost wages, punitive damages, attorney's fees, and any other legal or equitable relief as the court deems appropriate.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 (First Amendment)**
**Plaintiffs vs. Ridley Township**

248.    PLAINTIFFS incorporate the preceding paragraphs as though the same were set forth herein at length.

249.    As a Commissioner of Ridley Township at all relevant times, WILLERT is a policymaker for purposes of a claim against the TOWNSHIP under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

250.    WILLERT knew about the violations of PLAINTIFF's First Amendment rights and acquiesced to them.

251.    The TOWNSHIP is liable for its failure to take any action to stop the violations of PLAINTIFFS' First Amendment because of its policymakers' knowledge of, and acquiescence to, those violations.

252.    The TOWNSHIP's retaliation against PLAINTIFFS for their First Amendment protected speech were customs so well settled as to virtually constitute law.

WHEREFORE, PLAINTIFFS request compensatory damages, damages for lost wages, attorney's fees, and any other legal or equitable relief as the court deems appropriate.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 (Fourteenth Amendment Due Process — "stigma plus")**
**Plaintiffs vs. Scott Willoughby, Edward Pisani, Robert J. Willert, and Joseph Ryan**

253.    PLAINTIFFS incorporate the preceding paragraphs as though the same were set forth herein at length.

254.    PLAINTIFFS have a protected liberty interest in their reputation, honor, and integrity under a "stigma plus" theory.

255.    WILLOUGHBY made numerous false statements about PLAINTIFFS.

256.    By information and belief, PISANI falsely told CID that PLAINTIFFS broke into WILLOUGHBY's office.

257.    These false statements threaten PLAINTIFFS' ability to secure future employment.

258.    The credibility of a police officer is essential because they must testify in court as part of their regular job duties to secure convictions.

259.    The false statements threaten PLAINTIFFS' credibility as defense lawyers are aware of them and can use them as cross-examination ammunition.

260.    PLAINTIFFS also have a protected property interest in continued employment and for reductions in rank.

261.    PLAINTIFFS are members of a union — Delaware County Lodge No. 27 of the Fraternal Order of Police.

262.    Under the terms of the December 9, 2014 amendment to the collective-bargaining agreement between Delaware County Lodge No. 27 of the Fraternal Order of Police and the TOWNSHIP, PLAINTIFFS may be demoted from the rank of Detective only for "just cause." *See* (Exhibit 8 at Rank(c)).

263.    The December 9, 2014 amendment remains in effect today as subsequent amendments to the collective-bargaining agreement incorporate it by reference.

264.    Under Article IV, Section I of the Ridley Township Police Department Policy and Procedural Manual, PLAINTIFFS may be suspended, removed, or reduced in rank only for cause. *See* Exhibit 9.

265.    DEFENDANTS failed to provide PLAINTIFFS with any opportunity for a name-clearing hearing.

266.    WILLOUGHBY, PISANI, WILLERT, and RYAN deprived PLAINTIFFS of their liberty interest in their reputation, honor, and integrity both procedurally and substantively.

WHEREFORE, PLAINTIFFS request compensatory damages, punitive damages, attorney's fees, and any other legal or equitable relief as the court deems appropriate.

### FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983 (Fourteenth Amendment Due Process— "stigma plus")
### Plaintiffs vs. Ridley Township

267.    PLAINTIFFS incorporate the preceding paragraphs as though the same were set forth herein at length.

268.    The TOWNSHIP is liable for the "stigma plus" theory outlined in Count III.

269.    As a Commissioner of Ridley Township at all relevant times, WILLERT is a policymaker for purposes of a claim against the TOWNSHIP under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

270.    WILLERT knew about the violations of PLAINTIFF's due-process rights and acquiesced to them.

271.    The TOWNSHIP is liable for its failure to take any action to stop WILLOUGHBY'S violations of PLAINTIFF'S due-process rights because of its policymakers' knowledge of, and acquiescence to, those violations.

272.    The TOWNSHIP's violation of PLAINTIFFS's due-process rights and failure to provide a name-clearing here were customs so well settled as to virtually constitute law.

WHEREFORE, PLAINTIFFS request compensatory damages, attorney's fees, and any other legal or equitable relief as the court deems appropriate.

## FIFTH CAUSE OF ACTION
## PENNSYLVANIA'S WHISTLEBLOWER ACT
### Plaintiffs vs. Ridley Township, Scott Willoughby, and Robert J. Willert

273.    PLAINTIFFS incorporate the preceding paragraphs as though the same were set forth herein at length.

274.    Section 3 of Pennsylvania's Whistleblower Law provides that: "No employer may . . . retaliate . . . against an employee . . . because the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing." Act of Dec. 12, 1986, P.L. 1559, No. 169, § 3, as amended, *informally codified at* 43 PURDON'S. STAT. § 1423.

275.    The TOWNSHIP, WILLOUGHBY, and WILLERT are all PLAINTIFFS's "employer" under 43 PURDON'S STAT. § 1422.

276.    PLAINTIFFS made a "good faith report" to their employer or appropriate authority of WILLOUGHBY's wrongdoing through reports to PISANI and WILLERT.

277.    PLAINTIFFS reported WILLOUGHBY for violations of tampering with evidence, theft, interfering in active criminal investigations and prosecutions, for abuse of power as a police official, for lying to the Delaware County District Attorney's Office during an official

prosecution, lying to neighboring police districts to have narcotics investigations withdrawn, and interfering with police investigations on several occasions.

278.    WILLOUGHBY retaliated against Plaintiffs, denying them use of necessary police equipment, police staff, revealing the identity of their active confidential informant, threatening to expose BRYDGE's identity, threatening PLAINTIFFS. with physical assault, and numerous other acts known and unknown to PLAINTIFFS.

279.    WILLOUGHBY's retaliation against PLAINTIFFS was punitive in nature, severe and pervasive, and designed to create an abusive working environment.

280.    The TOWNSHIP demoted PLAINTIFFS and otherwise retaliated against them regarding their compensation, terms, conditions, location, or privileges of employment.

281.    Section 5 of Pennsylvania's Whistleblower Law provides that: "A court, in rendering a judgment in an action brought under this act, shall order, as the court considers appropriate, reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, actual damages or any combination of these remedies. A court shall also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, if the complainant prevails in the civil action." Act of Dec. 12, 1986, P.L. 1559, No. 169, § 5, as amended, *informally codified at* 43 PURDON'S. STAT. § 1425.

282.    WILLOUGHBY and WILLERT'S actions constitute willful misconduct within the meaning of 42 PA. CONS. STAT. § 8550.

WHEREFORE, PLAINTIFFS request all remedies available under Pennsylvania's Whistleblower Law, including back wages, reinstatement, fringe benefits and seniority rights, actual damages, costs of litigation, attorney's fees, and witness fees.

## SIXTH CAUSE OF ACTION
## DEFAMATION
### Plaintiffs vs. Scott Willoughby and Edward Pisani

283.    PLAINTIFFS incorporate the preceding paragraphs as though the same were set forth herein at length.

284.    Pennsylvania common law provides a cause of action for defamation.

285.    By statute, under 42 PA. CONS. STAT. § 8343(a), "the plaintiff has the burden of proving":

      (1)    The defamatory character of the communication.

      (2)    Its publication by the defendant.

      (3)    Its application to the plaintiff.

      (4)    The understanding by the recipient of its defamatory meaning.

      (5)    The understanding by the recipient of it as intended to be applied to the plaintiff.

      (6)    Special harm resulting to the plaintiff from its publication.

      (7)    Abuse of a conditionally privileged occasion.

286.    WILLOUGHBY provided highly offensive and unlawful statements which are a major misrepresentation of PLAINTIFFS character, history, activities or beliefs.

287.    WILLOUGHBY was aware that the information he provided was false and acted deliberately to defame PLAINTIFFS.

288.    In one instance, in an official police report to CID, WILLOUGHBY falsely accused Plaintiffs of burglarizing his office.

289.    WILLOUGHBY also recorded an audio statement for CID accusing PLAINTIFFS of the burglary.

290.   By information or belief, PISANI contacted CID to initiate the alleged burglary claims of WILLOUGHBY'S office.

291.   By information or belief, PISANI was aware that the burglary was a false creation by WILLOUGHBY but nevertheless provided WILLOUGHBY assistance with the intent to defame the PLAINTIFFS.

292.   WILLOUGHBY's defamatory statements are kept by CID and have become part of PLAINTIFFS' employment file.

293.   WILLOUGHBY also accused Plaintiffs of miscounting seized cash and back dated a supplemental police report blaming Plaintiffs for miscounting seized money.

294.   At all times WILLOUGHBY was aware that the information he provided was false and acted deliberately to defame PLAINTIFFS.

295.   These reports were published to the Delaware District Attorney's Office and CID.

296.   They are discoverable by the defense in any criminal case involving Plaintiffs.

297.   The defamatory reports are now part of the public record and will be heard by public citizens who attend court trials in which PLAINTIFFS are called to testify.

298.   As the result of WILLOUGHBY's defamation, whenever PLAINTIFFS are called to testify in a criminal case, they are subject to false attacks against their credibility and character.

299.   WILLOUGHBY defamed and caused special harm to PLAINTIFFS' character and credibility as police officers working in the Ridley Township community.

300.   Future employers and other law enforcement agencies are potential recipients of these defamatory reports and can or will question PLAINTIFF's reputation, character, and credibility.

301.    By information or belief, WILLOUGHBY also created, provided, stated, uttered and or maintained additional reports that defamed PLAINTIFFS.

302.    At all relevant times, WILLOUGHBY was acting within the course and scope of his employment with the TOWNSHIP.

303.    WILLOUGHBY's actions constitute willful misconduct within the meaning of 42 PA. CONS. STAT. § 8550.

WHEREFORE, PLAINTIFFS request compensatory damages, emotional damages, punitive damages, attorney's fees, and any other legal or equitable relief as the court deems appropriate.

## SEVENTH CAUSE OF ACTION
## INVASION OF PRIVACY—FALSE LIGHT
### Plaintiffs vs. Scott Willoughby and Edward Pisani

304.    PLAINTIFFS incorporate the preceding paragraphs as though the same were set forth herein at length.

305.    Pennsylvania has adopted the "false light" tort outlined in § 652E of the Restatement (Second) of Torts.

306.    Under § 652E:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

307.    PLAINTIFFS are decorated Ridley Township Police Officers.

308.     PLAINTIFFS have enjoyed a reputation of being honest, hardworking, and effective police officers in the law enforcement community.

309.     PLAINTIFFS have never been "written up" or had any disciplinary action or warnings against them issued by the Ridley Township Police Department.

310.     Moreover, PLAINTIFFS passed a rigorous screening process to work alongside the FBI.

311.     WILLOUGHBY provided highly offensive statements which are major misrepresentations of PLAINTIFFS character, reputation, competence, and credibility.

312.     WILLOUGHBY was aware that the information he provided was false and acted deliberately to have Plaintiffs viewed in a false light and to invade Plaintiffs privacy.

313.     PLAINTIFFS allege that WILLOUGHBY's statements have been made public and have been communicated to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.

314.     WILLOUGHBY's communications and falsities against Plaintiffs are now subject to discovery requests from criminal defense attorney(s), criminal defendants, by the Delaware District Attorney's office, and the Ridley community in attendance at public trials where Plaintiffs are subject to examination.

315.     WILBOUGHY'S false statements can be used as direct or impeachment evidence to attack Plaintiffs' police employment records and their reputation, competence, credibility, and professional and personal character.

316.     WILLOUGHBY's statements placed PLAINTIFFS in a false light that would be highly offensive to a reasonable person.

317.    WILLOUGHBY had knowledge or acted in reckless disregard as to the falsity of his statements about PLAINTIFFS and the false light in which PLAINTIFFS would be placed.

318.    At all relevant times, WILLOUGHBY was acting within the course and scope of his employment with the TOWNSHIP.

319.    WILLOUGHBY's actions constitute willful misconduct within the meaning of 42 PA. CONS. STAT. § 8550.

WHEREFORE, PLAINTIFFS request compensatory damages, emotional damages, punitive damages, attorney's fees, and any other legal or equitable relief as the court deems appropriate.

## EIGHTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Plaintiffs vs. Scott Willoughby, Edward Pisani, Robert J. Willert, and Joseph Ryan

320.    Plaintiffs incorporate the preceding paragraphs as though the same were set forth herein at length.

321.    Pennsylvania common law provides for a tort of intentional infliction of emotional distress.

322.    One who, by extreme and outrageous conduct, intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

323.    WILLOUGHBY threatened Plaintiffs that he would reveal their identity as undercover narcotics officers by posting their picture in the local newspaper.

324.    Then, WILLOUGHBY threatened to expose BRYDGES, giving the pictures to his "niggers" on the streets.

325.    WILLOUGHBY stated that he wanted his "niggers" from Chester to "get them," meaning that he sought to have PLAINTIFFS physically assaulted.

326.   PLAINTIFFS remain afraid of WILLOUGHBY's threats to hurt them.

327.   RYAN demoted PLAINTIFFS with the intent to inflict emotional distress.

328.   WILLARD approved the demotion of PLAINTIFFS with the intent to inflict emotional distress.

329.   By information and belief, PISANI falsely told CID that PLAINTIFFS broke into WILLOUGHBY's office with the intent to inflict emotional distress.

330.   At all relevant times, WILLOUGHBY, PISANI, WILLERT, and RYAN, were acting within the course and scope of his employment with the TOWNSHIP.

331.   WILLOUGHBY, PISANI, WILLERT, and RYAN's actions constitute willful misconduct within the meaning of 42 PA. CONS. STAT. § 8550.

332.   As the result of WILLOUGHBY'S actions, PLAINTIFFS suffered injuries, including, but not limited to, emotional pain and suffering, sleep deprivation, emotional distress, the loss of income, and other continuing injuries the direct result of WILLOUGHBY's conduct.

333.   PLAINTIFFS continue to suffer traumatic emotional effects the result of WILLOUGHBY's conduct.

WHEREFORE, PLAINTIFFS request compensatory damages, emotional damages, attorney's fees, and any other legal or equitable relief as the court deems appropriate.

**NINTH CAUSE OF ACTION**
**CIVIL CONSPIRACY**
**Plaintiffs vs. Scott Willoughby, Edward Pisani, Robert J. Willert, and Joseph Ryan**

334.   PLAINTIFFS incorporate the preceding paragraphs as though the same were set forth herein at length.

335.   Pennsylvania law renders conspirators liable for the torts of their co-conspirators.

336.    A civil conspiracy exists under Pennsylvania law where there is: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.

337.    WILLOUGHBY, PISANI, WILLERT, and RYAN conspired to perpetrate the wrongful acts alleged in this Amended Complaint.

338.    WILLOUGHBY, PISANIH, WILLERT, and RYAN all took overt acts to pursue their conspiratorial purpose.

339.    PLAINTIFFS reported WILLOUGHBY'S retaliatory acts against them by to PISANI and WILLERT.

340.    PISANI and WILLERT had a duty to prevent or stop WILLOUGHBY from taking wrongful action against PLAINTIFFS or to discipline WILLOUGHBY.

341.    PISANI and WILLERT failed to do so.

342.    Instead, PISANI and WILLERT covered up WILLOUGHBY's wrongful conduct.

343.    PISANI and WILLERT, at a police meeting, denounced PLAINTIFFS' complaints against WILLOUGHBY as unfounded.

344.    PLAINTIFFS suffered damages.

345.    WILLOUGHBY, PISANI, WILLERT, and RYAN are responsible for all of WILLOUGHBY's torts under a theory of civil conspiracy.

346.    WILLOUGHBY, PISANI, WILLERT, and RYAN were, at all relevant times, acting within the course and scope of their employment with the township.

347.    WILLOUGHBY, PISANI, WILLERT, and RYAN's actions constitute willful misconduct within the meaning of 42 PA. CONS. STAT. § 8550.

WHEREFORE, PLAINTIFFS request compensatory damages, emotional damages, attorney's fees, punitive damages, and any other legal or equitable relief as the court deems appropriate.

JURY DEMAND

Plaintiff requests a jury trial.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and back pay and front pay, punitive damages, liquidated damages, compensatory damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Respectfully submitted,

_/s/ Andres Jalon_

Andres Jalon, Esq. (Pa. I.D. No. 83685)
JALON & ASSOCIATES
17 W. Airy Street
Norristown, Pennsylvania 19401
ajalon@jalonesq.com

_Counsel for Plaintiffs_

_/s/ Robert Gamburg_

Robert Gamburg, Esq. (Pa. I.D. No. 68808)
Daniel J. Auerbach, Esq. (Pa. I.D. No. 316856)
Gamburg & Benedetto, LLC
1500 John F. Kennedy Blvd., Suite 1203
Philadelphia, PA 19102
robert@gamburglaw.com
dan@gamburglaw.com

_Co-Counsel for Plaintiffs_

Dated: March 8, 2021

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEAN BRYDGES and GERARD SCANLAN | : | |
| | : | |
| PLAINTIFFS, | : | |
| | : | |
| – vs. – | : | |
| | : | Civil Action |
| RIDLEY TOWNSHIP, SCOTT | : | |
| WILLOUGHBY, in his individual capacity, | : | No. 2:21-cv-00492 |
| EDWARD PISANI in his individual capacity | : | |
| ROBERT J. WILLERT in his individual | : | |
| capacity, and JOSEPH A. RYAN in his | : | |
| individual capacity, | : | |
| | : | |
| DEFENDANTS. | : | |

I certify that this paper was served on the following through this Court's CM/ECF system, which service satisfies FED. R. CIV. P. 5(b)(2)(E):

Scott Gottel, Esq.
Holsten & Associates
One Olive Street
Media, PA 19063

*Counsel for Defendant Ridley Township*

Marc S. Raspanti, Esq., Doulgas K.
  Rosenblum, Esq. & Joseph L. Gordon Esq.
Pietragallo Gordon Alfano Bosick & Raspanti
  LLP
1818 Market Street, Suite 3403
Philadelphia, PA 19103

*Counsel for Defendant Scott Willoughby*

Joseph J. Santarone, Jr., Esq.
Marshall Dennehey Warner Coleman &
  Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103

*Counsel for Defendant Robert J. Willert*

David J. MacMain, Esq. & Laurie A. Fiore,
  Esq.
MacMain, Connell & Leinhauser, LLC 433
W. MARKET STREET SUITE 200 WEST
CHESTER, PA 19382

*Counsel for Defendant Joseph A. Ryan*

Michael J. Engle, Esq. & Ashley E.
  Shapiro, Esq.
Armstrong Teasdale LLC
2005 Market Street
One Commerce Square, 29th Floor
Philadelphia, PA 19103

*Counsel for Defendant Edward Pisani*

– 1 –

_____/s/ Daniel J. Auerbach_____
Daniel J. Auerbach, Esq. (Pa. I.D. No. 316856)
Gamburg & Benedetto, LLC
1500 John F. Kennedy Blvd., Suite 1203
Philadelphia, PA 19102
dan@gamburglaw.com

*Co-Counsel for Plaintiffs*

Dated: March 8, 2021