**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Sean Brydges and Gerard Scanlan | Civil Action |
| vs. | No. 2:21-cv-00492 |
| Ridley Township, *et al.* | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT EDMOND
PISANI'S MOTION TO DISMISS UNDER RULE 12(b)(6)**

TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ........................................................................ 1

FACTUAL BACKGROUND .................................................................. 1

ARGUMENT ............................................................................. 5

I.    Plaintiffs state a valid First Amendment claim on the merits............................ 5

    A.    Pisani's only new argument, relying on *Foraker v. Chaffinch*, lacks merit ....... 6

    B.    As we already argued, the First Amendment protects reports of
        wrongdoing ................................................................ 8

II.    Plaintiffs have a valid due-process claim, although we agree that the only remedy
      is a name-clearing hearing............................................................ 11

III.    We consent to dismissal of the defamation, false-light, and IIED claim against
      Pisani only.......................................................................... 12

IV.    Plaintiffs sate a valid civil-conspiracy claim against Pisani........................... 12

    A.    Plaintiffs alleged ample facts against Pisani to show an unlawful
        combination with the requisite intent........................................... 12

    B.    Plaintiffs adequately plead the existence of an underlying tort ................. 16

V.    This Court should grant leave to amend to the extent that it finds any defects in
      Plaintiffs' pleading................................................................. 16

CONCLUSION .......................................................................... 17

## TABLE OF AUTHORITIES

**Cases**

*Azzaro v. County of Allegheny,*
     10 F.3d 968 (3d Cir. 1997) ............................................................... 10

*Baloga v. Pittston Area Sch. Dist.,*
     927 F.3d 742 (3d Cir. 2019) ............................................................... 8

*Commonwealth v. Musser Forests, Inc.,*
     146 A.2d 714 (Pa. 1958)................................................................... 15

*Connick v. Myers,*
     461 U.S. 138 (1983)....................................................................... 10

*De Ritis v. McGarrigle,*
     861 F.3d 444 (3d Cir. 2017) ................................................................ 9

*Dougherty v. Sch. Dist. of Phila.,*
     772 F.3d 979 (3d Cir. 2014) ................................................................ 7

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.,*
     482 F.3d 247 (3d Cir. 2007) ............................................................... 16

*Flora v. County of Luzerne,*
     776 F.3d 169 (3d Cir. 2015) ........................................................... 7, 10

*Garcetti v. Ceballos,*
     547 U.S. 410 (2006)..................................................................... 8–9

*Givhan v. Western Line Consol. Sch. Dist.,*
     439 U.S. 410 (1979)...................................................................... 11

*Javitz v. County of Luzerne,*
     940 F.3d 858 (3d Cir. 2019) ........................................................... 10–11

*Jerri v. Harran,*
     625 F. App'x 574 (3d Cir. 2015) (non-precedential)........................................ 7

*Monsanto v. Quinn,*
     674 F.2d 990 (3d Cir.1982). .............................................................. 11

*Palardy v. Township of Millburn,*
     906 F.3d 76 (3d Cir. 2018) ............................................................. 8, 9

*Pickering v. Bd. of Educ.*,
   391 U.S. 563, 568 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Zamboni v. Stamler*,
   847 F.2d 73 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Statutes**

18 PA. CONS. STAT. § 3921 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 PA. CONS. STAT. § 4910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 PA. CONS. STAT. § 4910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Rules**

FED. R. CIV. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## INTRODUCTION

We do not oppose Defendant Edmond Pisani's motion on four of the asserted grounds. We contest his position as to the First Amendment and as to civil conspiracy. On the First Amendment, his argument fails for the same reasons that the Township's similar argument does. The First Amendment protects government employees when they report misconduct. The law does not allow the Township or its employees to punish police officers for doing the right thing and reporting a fellow officer's misconduct.

On civil conspiracy, Pisani ignores the inherent nature of a conspiracy claim. It is a rare conspiracy case where the plaintiff has direct proof of conspiracy. Instead, conspiracy claims necessarily rely on circumstantial evidence. Plaintiffs amply pleaded the evidence that Pennsylvania courts demand for a circumstantial inference of a shared, unlawful purpose. Pisani told Willoughby about Plaintiffs' initial report of misconduct, triggering all of the events at issue here. Then he aided Willoughby by concealing further reports of wrongdoing, passing along Willoughby's false claims against Plaintiffs, and telling others that Plaintiffs' allegations against Willoughby were false. These facts amply show that he shared a purpose to retaliate against Plaintiffs.

## FACTUAL BACKGROUND

Plaintiffs Sean Brydges and Gerard Scanlan are Ridley Township police officers. Together, they constituted the Township's Anti-Crime Unit, a special investigative unit. Plaintiffs made numerous narcotics arrests, often seizing drugs and cash. The Township's procedures took special care to ensure accurate records and custody of cash. (Doc. 17: Amend. Compl. at ¶¶ 9–12, 34–38).

They learned that their direct supervisor, Captain Scott Willoughby, was tampering with evidence. The Criminal Investigation Division was investigating cash and other property missing from evidence. It turned out that Willoughby was responsible. During the investigation, he asked

Plaintiffs to help him conceal his theft of cash from evidence. Willoughby sought to conceal the theft by replacing the stolen funds with separate money obtained from who knows where. He asked Plaintiffs to re-package evidence even though that would break the chain of custody. They would not do so. (*Id.* at ¶¶ 20–26, 40–46).

Plaintiffs reported Willoughby's conduct to zTownship's Manager Edmond Pisani. Pisani told them that he would report the incident to the township's Police Commissioner, Robert J. Willert. Willert is also the President of the Township's Board of Commissioners. (*Id.* at ¶¶ 14, 47). The Board is the Township's executive decisionmaker.

Plaintiffs met with both Pisani and Willert. Plaintiffs were worried that Willoughby would retaliate against them. Pisani and Willert reassured Plaintiffs that they would not make Willoughby aware of the report. (*Id.* at 48–50).

Instead, Pisani told Willoughby about the report. Within two days, Willoughby was irate when he spoke with Plaintiffs. He took away their access to take-home vehicles, a decision Willert would later reverse. (*Id.* at 51–57).

In February 2016, Plaintiffs learned of additional misconduct. They participated in a nuisance-bar raid. It appeared to Plaintiffs that someone had tipped off the bar. At the same time, Willert was acting strangely and avoiding interacting with the nuisance-bar detail. Plaintiffs discussed the matter with Manager Pisani. Pisani discovered that Willoughby had called the bar before the raid. Again, Plaintiffs did the right thing. They asked Pisani to report the information to Commissioner Willert or to investigate. Plaintiffs do not believe that Pisani did anything. (*Id.* at 58–69).

In May 2016, Plaintiffs again learned of more misconduct. They learned that Willoughby again stole cash from evidence in one of their cases. This time, Willoughby acted to falsely implicate Plaintiffs. He asked another police officer to write and backdate a report. He did so. That report

falsely blamed the discrepancy on Plaintiffs' supposed miscounting of the cash in the first place. (*Id.* at ¶¶ 70–79).

Willoughby continued to attack Plaintiffs' reliability. He falsely accused them of exaggerating their arrest records and so exaggerating their effectiveness and success. (*Id.* at ¶¶ 80–86).

To try to make his false narrative real, Willoughby began to interfere with Plaintiffs' ability to prosecute cases. In June 2016, Plaintiffs learned that Willoughby took criminal evidence from one of their cases. Plaintiffs learned that Willoughby ordered other police officers not to return the missing evidence. The only apparent purpose of this act would be to threaten the viability of the prosecution. Willoughby also ordered officers not to help Plaintiffs by, for instance, transporting evidence to court or to forensic labs or documenting the chain of custody. (*Id.* at ¶¶ 87–104).

Willoughby's pattern of misconduct continued. He tried to abuse his position. He asked Plaintiffs to lie to a district attorney by falsely claiming that his friend's employee was a cooperator. Willoughby wanted to help out the friend's employee as payment in kind for home-improvement services that his friend had provided to him. Plaintiffs refused. (*Id.* at ¶¶ 115–120).

Similarly, Willoughby asked Plaintiffs to lie again to help get his daughter's boyfriend out of marijuana possession charges. Again, Plaintiffs refused. They did the right thing again. They reported this misconduct to superiors. (*Id.* at 121–27).

After that, Willoughby's retaliation got more serious. Plaintiffs had a reliable and effective confidential informant. Willoughby knew that. He disclosed the informant's identity to a defense-attorney friend of his. (*Id.* at ¶¶ 128–136). The revelation of a confidential informant's identity, of course, threatens that informant's work and safety. It also threatens Plaintiffs' reputation for trustworthiness when they deal with other potential informants. Nobody would want to be so outed. Nobody could trust a police officer who would allow that to happen.

Willoughby also acted to prevent Plaintiffs from working overtime. In doing so, he told other police officers that he intended to "get" Plaintiffs — meaning to retaliate against them. (*Id.* at ¶¶ 137–149).

Even worse, Willoughby threatened to endanger Plaintiffs. Plaintiff Brydges worked undercover. Willoughby threatened to post his picture to the public to reveal his identity. He also threatened to have people he knew from Chester to attack the Plaintiffs, or perhaps even kill them. (Id. at ¶¶ 150–158).

Plaintiffs became deeply concerned. They did not believe that Willoughby was making idle threats. Instead, they had concerns about their safety and the safety of their families. For instance, Plaintiff Brydges purchased security cameras for his house. (Id. at ¶¶ 159–160).

Plaintiffs took steps to address their concerns. They again spoke to Manager Pisani and Commission Willert. Pisani and Willert acknowledged that Willoughby had admitted to making the threats. Plaintiffs explained that they could not work under Willoughby given his abuse and threats. (*Id.* at ¶¶ 161–165).

Pisani and Willert claimed that they would address the situation. Instead, Willert and Pisani told other police officers that Plaintiffs' claims were baseless. (*Id.* at ¶ 166).

Willoughby continued to retaliate against Plaintiffs. In July 2019, he tried to prevent them from receiving overtime pay, although that decision was later reversed after Plaintiffs filed a grievance and spoke with Manager Pisani. Pisani also reassured Plaintiffs that he would talk to Commissioner Willert to help end Willoughby's retaliation. (*Id.* at ¶¶ 167–80).

The retaliation did not end. Willoughby claimed that someone burglarized his office. He falsely implicated Plaintiffs. (*Id.* at181–189). Willoughby also took yet more steps to deny Plaintiffs' overtime by preventing them from serving during an August 2020 protest. (*Id.* at ¶¶ 190–199).

The pattern of retaliation culminated in December 2020. Plaintiffs learned of an on-going federal criminal investigation of Township officials. Commissioner Willert believed that Plaintiffs were responsible for the investigation by providing the information that led to the federal investigation. (*Id.* at ¶¶ 200–202).

Willert decided to personally participate in the retaliation. He advanced a purported reorganization of the Police Department. Under that plan, the Department disbanded Plaintiffs' Anti-Crime Unit. Plaintiffs were transferred to a patrol division and demoted to the rank of Patrolman. Even though the agreements between Ridley Township and the police union requires demotion only for "just cause," Plaintiffs received no process prior to demotion. (*Id.* at ¶¶ 203–215, 262).

During all of this time, Commissioner Willert was aware of everything that was happening to Plaintiffs. Yet he did nothing to stop the abuse. While he acted on the margins, such as by restoring their use of "take home" vehicles and addressing some of the overtime issues, he did not meaningfully act. Instead, he furthered the retaliation against Plaintiffs through the purported restructuring of the Police Department.

## ARGUMENT

### I.     Plaintiffs state a valid First Amendment claim on the merits.

Much like the Township, Pisani challenges our First Amendment retaliation claim because Plaintiffs spoke as citizens. We already explained why this argument was not correct in response to the Township's motion. He raises one new argument. We address that argument first. Then, for completeness and to ensure that we do not waive any arguments, we reiterate essentially verbatim our analysis from our brief responding to the Township's motion.

### A.   Pisani's only new argument, relying on *Foraker v. Chaffinch*, lacks merit.

Pisani claims that the Third Circuit's decision in *Foraker v. Chaffinch*, 501 F.3d 231 (3d Cir. 2007), *abrogated on other grounds* 564 U.S. 379 (2011), supports rejecting our claim. Pisani is not correct because he misconstrues the decision.

On First Amendment retaliation, the essential question is when a public employee's speech relating to his job is protected speech and when it is not. As we outlined in our brief in response to the Township's arguments, the question is whether the employee's speech is part of his job duties or not. Speech beyond the employee's job duties is protected.

Both *Foraker* and Pisani agree with that analysis. Where we split ways is with Pisani's application of *Foraker*.

In *Foraker*, the Third Circuit found that speech was not protected because it was a necessary part of the employee's job duties. The plaintiffs were instructors at the Pennsylvania State Police's Firearms Training Unit. They were concerned that the shooting range did not provide adequate safety systems to address lead exposure from shooting guns. They complained to superiors about the conditions. They were ordered to make a statement to a state auditor regarding the conditions at the shooting range. They did so. Their attorney then read their statement to the auditor to the press. After that, they were ultimately ordered to "submit to a hearing examination to determine whether they were fit for duty." The plaintiffs sued, claiming First Amendment retaliation for their complaints about the environmental conditions at the range.

The Third Circuit found that the plaintiffs' speech was not protected only because it was "among the tasks that [the plaintiffs] were paid to perform." As shooting instructors, they had to maintain the shooting range. They were expected to raise "any environmental concerns" as a "routine operation[]." Annual performance reviews assessed their ability to do so. In addition, the

statements to the auditor were also part of the plaintiffs' job because they were ordered to make the statement. As a result, the plaintiffs did not speak as citizens in making their statements, and so had no First Amendment protection.

Here, Plaintiffs' report of Willoughby's wrongdoing and efforts to address subsequent retaliation is different. Plaintiffs are not paid to report wrongdoing. There is no evidence before this Court that would support an inference that their job duties mandated these reports, unlike the plaintiffs in *Foraker*. Plaintiffs' speech is protected.

The Third Circuit has subsequently distinguished *Foraker* on this precise basis. For instance, in *Flora v. County of Luzerne*, 776 F.3d 169 (3d Cir. 2015), *Foraker* did not apply because the plaintiff was not paid to engage in the conduct at issue. The plaintiff was the Chief Public Defender. He complained to county officials about inadequate funding, equipment, and staffing. He then sued the county, seeking additional funding. The court ruled for the defender, ordering more funding. The defender then faced fallout from the "Kids for Cash" scandal. He noted that the county had failed to address certain fallout from that scandal, raising those concerns with various court and county officials. The county then fired the defender.

The Third Circuit found that the various complaints were *not* part of the defender's regular job duties and so were protected speech. While the defender sought to aid his clients, his speech was protected because he sought to remov[e] impediments to proper government functioning." The Third Circuit thus rejected the county's argument that *Foraker* barred the defender's claim.

The Third Circuit has made similar rulings in other cases. *See Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979 (3d Cir. 2014) (finding that the Deputy Chief Business Officer of the School District spoke as a citizen despite *Foraker* when he disclosed that the district improperly steered a contract to an ineligible contractor); *Jerri v. Harran*, 625 F. App'x 574, 580 (3d Cir. 2015) (non-precedential)

(finding that a chief of a fire company's complaints to reporters and law enforcement about the wisdom of purchasing a "fire boat" was speech as a citizen despite *Foraker*).

### B.   As we already argued, the First Amendment protects reports of wrongdoing.

A First Amendment retaliation claim requires a plaintiff to prove that: "(1) he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link [existed] between the constitutionally protected conduct and the retaliatory action." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Palardy v. Township of Millburn*, 906 F.3d 76, 80–81 (3d Cir. 2018)) (internal quotation marks omitted).

Pisani challenges only the first element, whether Plaintiffs "engaged in constitutionally protected conduct." Because Plaintiffs are public employees, special requirements apply to that element of a retaliation claim.

While public employees do not "surrender" their First Amendment rights merely because they work for the government, *id.* at 753 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)), public employers have some room to regulate employee speech. In assessing whether an employer acted lawfully, courts balance "the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (cleaned up).

A three-prong test applies to assessing this balance. The Third Circuit asks: "(1) whether the employee spoke as a citizen; (2) whether the statement involved a matter of public concern; and (3) whether the government employer nevertheless had 'an adequate justification for treating the employee differently from any other member of the general public' based on its needs as an

employer. *Id.* (quoting *Palardy*, 906 F.3d at 81). These prongs are all necessary elements of a claim. *See id.* at 753–59.

Pisani misunderstands the law. He challenges only the first prong — whether Plaintiffs "spoke as [citizens]." Under that element, the First Amendment does not protect employee speech "pursuant to their job duties." *De Ritis v. McGarrigle*, 861 F.3d 444, 453 (3d Cir. 2017) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).

For instance, if White House Press Secretary Jen Psaki got up on the podium and informed the public that Joe Biden was not actually the President based on "Q Anon" conspiracy theories, the Biden administration could fire her. The First Amendment would not bar that. The federal government pays Ms. Psaki to deal with the press. It can restrict how she carries out her job duties.

Pisani in contrast believes that what controls is whether Plaintiffs' speech was about their job. But whether an employee spoke "within the office" is not controlling. *Id.* Employees can receive protection for "expressions made at work." *Garcetti*, 547 U.S. at 420.

To distinguish whether an expression made at work is "within the scope of the employee's duties, courts must make a "practical inquiry." *Garcetti*, 547 U.S. at 424. There are not hard-and-fast rules.

*De Ritis* illustrates how this Court should conduct that inquiry. There, a public defender was transferred to the juvenile-court unit. The defender believed that the transfer was punishment for failing to induce enough clients to plead guilty. The defender shared this "rumor" while physically present in court but prior to the commencement of on-record proceedings. The defender also met with the County Solicitor and the chairman of the County Council in private to complain.

The Third Circuit explained that the in-court statements were part of the defender's duties, but the complaints to the Solicitor and to the chairman were not. Part of the defender's job was to "build rapport" with courts and opposing counsel. Sharing a rumor in court, even off the record, affected

– 9 –

those duties. Moreover, the off-the-record statements could have an effect on the proceedings in which the defender was involved. As a result, sharing "rumors" while in court was not "citizen" speech. In contrast, discussing those "rumors" outside of court *was* "citizen" speech even though made to the defender's superiors. The defender's complaints to superiors were not what he "was paid to perform on an ordinary basis."

Applying similar reasoning here, Plaintiffs' report of misconduct is not speech as a citizen. The Township does not pay Plaintiffs to make complaints about the malfeasance of others. They are not the Inspectors General of Ridley Township. They are police officers. They reported Willoughby's misconduct and retaliation to superiors. That is much like the defender's complaints to superiors that the Third Circuit found to be citizen speech in *De Ritis*.

In addition, there is an entirely separate and distinct legal principle that makes clear that Plaintiffs' spoke as citizens. The First Amendment protects a public employee's report of "malfeasance or misfeasance." *Javitz v. County of Luzerne*, 940 F.3d 858, 864 (3d Cir. 2019). The "speak as a citizen" element does not defeat internal reports of malfeasance or misfeasance. Reporting wrongdoing is not "within the realm" of an employee's "ordinary job duties." *Id.* (quoting *Flora v. County of Luzerne*, 776 F.3d 169, 180 (3d Cir. 2015)). As a result, interpreting the citizen-speech prong to restrict internal reports of wrongdoing would "unduly restrict First Amendment rights." *Id.* (quoting *Flora*, 776 F.3d at 180).

The Third Circuit and the Supreme Court have found that any number of internal reports or complaints are protected speech, including:

- An employee's report to her direct supervisor that a department head made unwelcome sexual advances. *Azzaro v. County of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997).

- An assistant district attorney's question to his co-workers about whether they ever felt pressured to assist political campaigns. *Connick v. Myers*, 461 U.S. 138, 149 (1983).

- A teacher's demands to her principal regarding the school board's policies and practices. *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 413 (1979).

- A police officer telling a county prosecutor that he disagreed with the prosecutor's proposed office reorganization and promotion plan. *Zamboni v. Stamler*, 847 F.2d 73, 77 (3d Cir. 1988) (emphasis added).

- An employee's letter to his department head criticizing the management of his department. *Monsanto v. Quinn,* 674 F.2d 990, 996–97 (3d Cir.1982).

- An employee's report to her supervisor about her concerns that workplace meetings were being illegally recorded. *Javitz*, 940 F.3d at 865.

Plaintiff spoke as citizens by reporting Willoughby's malfeasance. He tampered with evidence, stole cash held in evidence, and retaliated against Plaintiffs for reporting that malfeasance. These acts are wrongful malfeasance or misfeasance. Tampering with evidence is a crime. 18 PA. CONS. STAT. § 4910. Stealing cash held in evidence is a crime. 18 PA. CONS. STAT. § 3921 (a). Instructing employees to lie and fabricate evidence is criminal as an attempt to tamper with evidence in violation of 18 PA. CONS. STAT.§ 4910. Even setting aside these and possibly other crimes, Willoughby's course of conduct was misfeasance or malfeasance. The First Amendment and Pennsylvania law prohibit retaliation against employees who report wrongdoing.

Plaintiffs' subsequent statements regarding retaliation against them for reporting Willoughby's initial misconduct is also speech as a citizen for similar reasons. Retaliation is misfeasance or malfeasance.

## II.     Plaintiffs have a valid due-process claim, although we agree that the only remedy is a name-clearing hearing.

After careful review, we have chosen not to seek damages for any due-process violation, although we believe that Third Circuit precedent leaves open that possibility. We ask this Court to permit Plaintiffs leave to amend their Complaint to explicitly seek a name-clearing hearing. We will leave a formal motion for once the various pending Rule 12(b)(6) motions are resolved.

We need maintain that claim only against the Township — which failed to provide any process for a name-clearing hearing — and so agree that no due-process claim should proceed against Pisani.

**III.     We consent to dismissal of the defamation, false-light, and IIED claim against Pisani only.**

We do not challenge Pisani's motion to dismiss the defamation, false-light, and IIED claims of Counts VI to VIII of the Amended Complaint against Pisani. This agreement extends **only** to Pisani.

**IV.     Plaintiffs sate a valid civil-conspiracy claim against Pisani.**

Pisani challenges Plaintiffs' detailed pleading on the basis that it does not adequately explain how Pisani engaged in civil conspiracy. But Plaintiffs' allegations were more than enough to state a claim.

"To state a cause of action for civil conspiracy, a plaintiff must show "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *Skipworth ex rel. Williams v. Lead Indus. Ass'n*, 690 A.2d 169, 174 (Pa. 1997) (citing *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979).

Here, Willoughby engaged in a wrongful course of retaliation against Plaintiffs for his reporting of his misdeeds. Pisani concealed that conduct, aided Willoughby, and refused to do anything about it. That is enough to reject Pisani's argument that there was no conspiracy and no underlying tort.

**A.     Plaintiffs alleged ample facts against Pisani to show an unlawful combination with the requisite intent.**

As to Pisani, Plaintiffs pled the following detailed facts to show his involvement in a conspiracy:

19.     At all relevant times, PISANI and WILLERT were high ranking Ridley Township officials who received complaints of corruption occurring with the police . . . .

28.     When PLAINTIFFS reported WILLOUGHBY to PISANI, PISANI advised them that their report would be confidential, that WILLOUGHBY would not find out who made the report against him.

29.     Almost immediately after PLAINTIFFS first report to PISANI, WILLOUGHBY began retaliating against PLAINTIFFS . . . .

31.     For the next few years, PLAINTIFFS reported every incident of WILLOUGHBY's retaliation against them to PISANI and WILLERT.

32.     Since 2014, WILLOUGHBY has continuously retaliated against PLAINTIFFS.

33.     PISANI and WILLERT failed to act to stop WILLOUGHBY's retaliation.

45.     When PLAINTIFFS looked at the sealed evidence-bags, they realized that the bags had been tampered with.

46.     PLAINTIFFS realized that the bills that were in evidence bags were not the same as what they had seized; the evidence bags had been re-packaged.

47.     PLAINTIFFS immediately notified Ridley Township's manager, PISANI who advised them that he would notify Police Commissioner WILLERT.

48.     PLAINTIFFS met with PISANI and WILLERT to explain the incident in person.

49.     At the meeting, PLAINTIFFS expressed concerns because WILLOUGHBY was their "boss" and, if he became aware of their report, he would retaliate against them.

50.     PISANI and WILLERT reassured Plaintiffs that no one would be aware of the report.

51.     By information or belief, PISANI told WILLOUGHBY about PLAINTIFFS' report to PISANI.

52.     WILLOUGHBY seemed irate and angry at PLAINTIFFS two days after they made their report to PISANI and WILLERT.

64.      PLAINTIFFS advised PISANI that it was their opinion that someone [, likely Willoughby,] tipped off the owner of the RS Club [that it would be subject to a raid].

65.      PISANI agreed that WILLOUGHBY was acting strange and that he was patrolling everywhere in town but where the detail was.

66.      The following week, PISANI told PLAINTIFFS that he reviewed phone calls from WILLOUGHBY's office and discovered calls to the owner of the RS Club Bar, prior to the liquor raid.

67.      PLAINTIFFS demanded that PISANI report this discovery to WILLERT and to begin an immediate investigation of WILLOUGHBY.

68.      By information or belief, PISANI did not investigate WILLOUGHBY.

69.      By information or belief, WILLOUGHBY learned of PLAINTIFFS' report to PISANI from PISANI . . . .

166.     By information or belief, sometime later, after Ridley Township Police meeting, WILLERT and PISANI advised the sergeants in attendance that PLAINTIFFS's claims about WILLOUGHBY were un-substantiated . . . .

243.     At all relevant times, RYAN, PISANI, and WILLERT were high-ranking Ridley Township officials but failed to investigate WILLOUGHBY and stop his retaliation against PLAINTIFFS because of PLAINTIFFS' protected speech . . . .

290.      By information or belief, PISANI contacted CID to initiate the alleged burglary claims of WILLOUGHBY'S office.

291.     By information or belief, PISANI was aware that the burglary was a false creation by WILLOUGHBY but nevertheless provided WILLOUGHBY assistance with the intent to defame the PLAINTIFFS . . . .

340.     PISANI and WILLERT had a duty to prevent or stop WILLOUGHBY from taking wrongful action against PLAINTIFFS or to discipline WILLOUGHBY.

341.     PISANI and WILLERT failed to do so.

342.     Instead, PISANI and WILLERT covered up WILLOUGHBY's wrongful conduct.

343.     PISANI and WILLERT, at a police meeting, denounced PLAINTIFFS' complaints against WILLOUGHBY as unfounded.

– 14 –

These allegations establish the necessary elements of civil conspiracy. "It is well established, and sustained by abundant authority, that a conspiracy may be proven by circumstantial evidence . . . . The rule is, of course, not limited to criminal conspiracy; it is equally applicable to cases involving civil conspiracy. *Commonwealth v. Musser Forests, Inc.*, 146 A.2d 714, 716 (Pa. 1958) (internal citations omitted). There is no requirement of "direct and positive testimony of a collusive agreement to do something wrongful." *Id.* Instead, the "least degree of concert or collusion between parties" is enough. *Id.*

For instance, in *Musser Forests*, the existence of a shared desire to profit from a breach of contract was sufficient to establish a civil-conspiracy claim on the pleadings. The Commonwealth alleged that a company agreed to purchase at cost seedlings and trees from the Commonwealth to plant in Pennsylvania. The idea was to support tree planting for natural conservation. Instead, the corporation and the defendant officers or stockholders of that corporation planted the trees and then sold them for profit in breach of the contract. The defendants then falsely reported that they used the seedlings and trees appropriately. This scheme financially benefitted all of the defendants. That was enough to prove that the defendants acted with the "common purposed of defrauding the Commonwealth for their personal gain."

Similarly, here, Pisani was aware of what was going on with Willoughby. Plaintiffs told him about it. He could have done something about it. Instead, he told Willoughby about Plaintiffs' report, leading to the initial retaliation. He then concealed information that Plaintiffs reported to him about Willoughby. He assisted Willoughby by passing along Willoughby's false claim that Plaintiffs burglarized his office. And he told other officers that Plaintiffs' claims about Willoughby were false.

These facts support the inference that Pisani and Willoughby acted with a common, improper purpose. They both acted towards the same goal of furthering retaliation against Plaintiffs for reporting Willoughby's wrongdoing.

**B.     Plaintiffs adequately pled the existence of an underlying tort.**

Pisani's claim that Plaintiffs failed to plead an underlying tort also fails. Once a conspiracy exists, the conspirators are responsible for any tort committed in furtherance of it. The supposed fact that "only two of the four defendants," (Pisani Br. 18), participated in some of these torts is irrelevant. What matters is whether there was *any* underlying tort.

Pisani offers no argument that there was never any tort. Instead, Pisani just emphasizes his own arguments that *he* supposedly did not commit an actionable wrong. But that does not matter.

At the absolute least, Willoughby committed legal wrongs. Pisani does not even try to argue that Willoughby never committed an underlying legal wrong. Because Pisani conspired with Willoughby, Pisani is liable.

**V.     This Court should grant leave to amend to the extent that it finds any defects in Plaintiffs' pleading.**

To the extent that this Court agrees with any of Pisani's arguments besides those we do not oppose, it should grant Plaintiffs leave to amend their Complaint. The Third Circuit has squarely explained: "[I]n civil rights cases district courts must offer amendment — irrespective of whether it is requested — when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007). Even as to Plaintiffs' non-civil-rights claims, this Court should grant leave to amend "freely . . . when justice so requires." FED. R. CIV. P. 15(a)(2).

Here, many of Pisani's complaints are technical, faulting Plaintiffs for supposed bare-bones pleading . We could add additional details to address any concerns that this Court might have with Plaintiffs' pleading.

## CONCLUSION

Plaintiffs ask this Court to deny Pisani's 12(b)(6) motion, except as to the Due Process Clause, defamation, false-light, and IIED claims. We will further seek leave to amend to explicitly add a request for a name-clearing hearing, but to remove a claim for damages for the due-process violation.

Respectfully submitted,

_/s/ Daniel J. Auerbach_
Robert Gamburg, Esq. (Pa. I.D. No. 68808)
Daniel J. Auerbach, Esq. (Pa. I.D. No. 316856)
Gamburg & Benedetto, LLC
1500 John F. Kennedy Blvd., Suite 1203
Philadelphia, PA 19102
robert@gamburglaw.com
dan@gamburglaw.com

_Co-Counsel for Plaintiffs_

_/s/ Andres Jalon_
Andres Jalon, Esq. (Pa. I.D. No. 83685)
Jalon & Associates
17 W. Airy Street
Norristown, Pennsylvania 19401
ajalon@jalonesq.com

_Counsel for Plaintiffs_

Dated: May 7, 2021

## CERTIFICATE OF SERVICE

This document has been filed electronically and is available for viewing and downloading from the ECF system. All parties have been served through ECF as all parties are represented by counsel who have consented to electronic service.

_____/s/ Daniel J. Auerbach_____
Robert Gamburg, Esq. (Pa. I.D. No. 68808)
Daniel J. Auerbach, Esq. (Pa. I.D. No. 316856)
Gamburg & Benedetto, LLC
1500 John F. Kennedy Blvd., Suite 1203
Philadelphia, PA 19102
robert@gamburglaw.com
dan@gamburglaw.com

*Co-Counsel for Plaintiffs*

Dated: May 7, 2021